The TIMKEN COMPANY, Plaintiff,

v.

W. VAUGHAN, Lt. Gen. U. S. A., Director, Defense Supply Agency, et al., Defendants.

Civ. A. No. C 76–92 A.

United States District Court, N. D. Ohio, E. D.

May 3, 1976.

J. Sean Keenan, Day, Ketterer, Raley, Wright & Rybolt, Canton, Ohio, Ronald Michael Green, Vedder, Price, Kaufman, Kammholz & Day, New York City, for plaintiff.

David L. Rose, Deborah Seymour, Dept. of Justice, Washington, D.C., for defendants.

MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Plaintiff, The Timken Company (hereinafter Timken), initiated this action on March 24, 1976, to review the March 22, 1976 final Decision and Order of the Defense Supply Agency, Department of Defense (hereinafter D.S.A.), debarring Timken from eligibility for contracts with the United States or agencies thereof, and with contractors doing business with the United States or agencies thereof. A declaratory judgment and injunctive relief are sought. The Court's jurisdiction is invoked pursuant to the Administrative Procedure Act, 5 U.S.C. § 701, et seq., 28 U.S.C. §§ 1331, 1343, 1344, 1361, 2201 and 2202.

A temporary restraining order was issued on March 29, 1976, staying the subject Decision and Order. The preliminary and final hearings were consolidated, and final arguments were heard on April 16, 1976.[1]

The administrative history of this case commenced in September, 1973, when two D.S.A. representatives visited Timken's Bucyrus facility. The purpose of said visit was to review Timken's compliance status under Executive Order No. 11246, as amended,[2] and to review Timken's proposed Affirmative Action Plan (hereinafter AAP) for the twelve month period commencing in September, 1973, for its Bucyrus facility. The D.S.A. representatives concluded that the proposed AAP was unacceptable, although the prior year's AAP which was for all relevant purposes identical to the 1973 proposal, had been accepted.

D.S.A.'s objections were not resolved by Timken's November 30, 1973 revision of the proposed AAP. Thereafter, on December

---

1. Also pending before the Court is defendants' motion for summary judgment. As the issues raised by said motion are coterminous with the ultimate issues of the case, no further specific mention of said motion shall be made.

2. The Executive Order is reported at 42 U.S.C. § 2000e note.

27, 1973, D.S.A. issued a "show cause" letter to Timken, stating therein that Timken's AAP for Bucyrus was deficient because of its failure "to include the minority labor force situated within reasonable recruitment range of the facility." Therefore, the letter continued, the AAP's utilization analysis was "unacceptable" and the goals and timetables "unrealistic."

The parties again failed to resolve the problem. By letter dated June 10, 1974, D.S.A. notified Timken of the proposed cancellation or termination of all Timken contracts with the government or with other government contractors; Timken was further notified of its proposed debarment from future government contracts or subcontracts. Said letter also states:

"On 27 September 1973, an onsite Equal Employment Opportunity compliance review was initiated at your Bucyrus, Ohio facility. During the course of the review it was determined that a restrictive area of recruitment (about 16 miles distance from the facility) existed beyond which your company would hire whites but refused to hire minorities.

"It was further determined that Timken's goals and timetables are based on a 16 mile recruiting area which has about .6% minorities to the total population. The City of Mansfield, only 9 miles outside the current recruitment area, is within a reasonable commuting availability distance to Bucyrus and should be included in Timken's designated recruiting area. The new 25 mile radius would provide at least a 3.5% availability figure which should be reflected in your Company's new goals and timetables.

"The Timken Company is in violation of Executive Order 11246 which requires federal contractors to refrain from discriminating in their employment practices. In addition, the Company's goals and timetables are unrealistic and not in consonance with requirements of 41 CFR 60–2.11 and 60–2.12 respectively."

Said letter concluded by informing Timken of its right to respond to said charges and to request a hearing thereon.

On June 28, 1974, Timken formally responded by letter. Therein Timken essentially denied the allegations and asserted several affirmative defenses. Timken also requested a hearing.

On September 12, 1974, counsel for Timken and for D.S.A. appeared before an administrative law judge for a "pre-hearing conference." At that time, the administrative law judge familiarized himself with the issues presented by the case and generally established procedures and a timetable for prosecution of the hearing. It was further decided at said conference that the June 10, 1974 D.S.A. letter to Timken would constitute the "complaint," and that the June 28, 1974 response of Timken would constitute the "answer" for the purposes of the hearing.

With the issues thus framed, the matter was heard on November 25 and 26, 1974. At that time, a stipulation entered into by the parties on November 18, 974, was approved by the administrative law judge, and the testimony of various witnesses was heard and numerous exhibits were introduced into evidence.

While a more detailed recitation and analysis of the evidence presented will be developed below, at this point the Court finds it appropriate to summarize the general factual background of this action.

Timken manufactures tapered roller bearings, specialty alloy steel, and rock bits at numerous facilities in the United States and world wide. As part of its operations, Timken supplies its products to agencies of the United States both through direct contracts with said agencies and through subcontracts with other contractors with said agencies. Therefore, Timken is subject to Executive Order 11246, as amended.

Timken operates a bearing plant and a distribution center for finished bearings in Bucyrus, Ohio. Bucyrus is located in the southwest quadrant of Crawford County, Ohio. Bucyrus is a comparatively small city, with a population of approximately 15,000 persons and is located approximately 15 miles from the Crawford County-Richland County line. Timken employs approxi-

mately 1370 persons at its Bucyrus facility. There are thirteen other major employers in Bucyrus, employing approximately 2,809 employees.[3]

Crawford County is predominantly rural in character, and has a population of approximately 50,000 persons. There are approximately 360 minorities residing in Crawford County. Richland County abuts the eastern border of Crawford County, and Wyandot County abuts the western border of Crawford County. The cities of Crestline and Galion are located in the southeast quadrant of Crawford County, near the Crawford County-Richland County line.

Mansfield is approximately 25 miles east of Timken's Bucyrus facility. Mansfield is the county seat of Richland County; it is a highly industrialized urban center with a population of approximately 55,000 persons. Approximately 8,300 minorities reside in Mansfield, which is approximately 15.1% of that city's total population. Mansfield has approximately 194 manufacturers, 7 of whom employ in excess of 1000 employees each.

Richland County has a population of approximately 130,000 persons, of whom approximately 8,900, or 6.19%, are minorities. Timken hires its employees from those applicants residing within a fourteen to sixteen mile radius from its plant.[4] This area encompasses all of Crawford County and the eastern portion of Wyandot County. Said hiring area does not extend to any portion of Richland County.

Timken utilizes this hiring area for two reasons. The first reason is its experience that the further away from the plant that an employee resides, the greater the rate of absenteeism, tardiness, and termination of employment.[5] These results increase Timken's training costs and reduces productivity. The second reason, though more difficult to demonstrate empirically, involves Timken's attempts to increase productivity by demonstrating to its employees an identity of employer-employee interests. Timken seeks to accomplish this by locating in comparatively small communities, actively involving itself in community affairs, and repeated donations to local charities. It is hoped that these actions, when combined with the obvious facts of the beneficial effects of payrolls and local taxes on the local community, will encourage employees to realize that their own well-being is tied to Timken's prosperity. The value of these efforts is limited, Timken contends, when its employees do not reside in or near the communities benefiting therefrom.

While Mansfield is only approximately twenty-five miles from Bucyrus, the most direct route between these cities is a comparatively old, two-lane highway which is heavily traveled by both automobiles and trucks. It takes approximately thirty-five to forty-five minutes to travel from Mansfield to Timken's facility in Bucyrus.

Evidence was introduced at the administrative hearing regarding the commuting habits of persons residing in Crawford and Richland counties. This evidence primarily consisted of statistical data relating the county of residence to the county of employment, and information indicating the number of Mansfield residents working in Bucyrus and the number of Bucyrus residents working in Mansfield.

Evidence was also introduced which indicated that during the years 1972, 1973, and the first ten months of 1974, Timken aggressively hired minorities at its Bucyrus facility. It appears that during said period, minorities were hired both after a shorter waiting period than nonminority and at a significantly higher rate than the percentage of minority applicants. Although only 0.6% of the persons residing in Timken's hiring range were minorities, Timken increased its proportion of minority employ-

---

3. "Major employers" are those employing fifty or more persons.

4. For the sake of convenience, this hiring radius shall hereinafter be referred to as 15 miles.

5. "Termination" means both dismissals and voluntarily quitting.

ees from 1.4% in 1972 to 2.4% in October 1974.

The administrative law judge found in favor of Timken as to the first discriminatory practice alleged in the June 10, 1974 "complaint;" that is, the administrative law judge concluded that Timken applied its fifteen mile hiring radius without regard to race. As to the remaining claim advanced by the complaint, the following conclusions of law were proposed and adopted:

"3. The Timken Company's Bucyrus facility is within reasonable commuting distance from Mansfield, Ohio. Therefore, the Company was required to consider the minority population of Mansfield when analyzing its work force for possible underutilization of minorities pursuant to 41 CFR 60–2.11. In reaching this conclusion that Mansfield is a reasonable commuting distance from Bucyrus and should have been included in the underutilization analyses the following circumstances were considered.

"a. Mansfield is relatively close to Bucyrus, about 25 miles and 35–45 minutes driving time.

"b. The relatively small minority population in Crawford County while there is a relatively larger minority population a short distance away in Mansfield.

"c. Timken's fifteen mile hiring radius is itself an arbitrary determination.

"4. The goals and timetables contained in Timken's AAP should have been based on an underutilization analyses [sic] that included consideration of the minority population of Mansfield. Therefore, Timken's goals and timetables, as set forth in the AAP, are not valid and in accordance with the Order and the affirmative action requirements of 41 CFR 60–2.

"5. The business considerations relied upon by Timken to justify excluding Mansfield from the area of employment consideration are too conjectural, not supported by qualitative or quantitative evidence and not sufficient to justify frustrating the purposes and aims of the Or-

der and the implementing rules and regulations. [Footnote omitted.]

"6. Timken further contends that because there are many employers in Mansfield, and because of the impact of the energy crisis and economic recession, Mansfield's residents would not seek or desire employment 25 miles away, or would do so in relatively smaller numbers and that to include Mansfield in its area for statistical analyses would lead to a distortion in its AAP analyses and goals and timetables. These contentions must be rejected because, again they are too conjectural and to the extent they can be demonstrated, they can be taken into account in Timken Company AAP's minority underutilization analyses and goals and timetables.

"7. The hiring policy of Timken in refusing to hire or recruit applicants further than 15 miles, where the hiring area considered by Timken has a very small minority population and where it arbitrarily excludes a large number of minority persons who live within reasonable commuting distance, is by its very nature discriminatory and violative of the Order.

"9. The Timken Company's proposed 1973–74 AAP for its Bucyrus facility does not comply with the Order and the requirements of 41 CFR 60–2.11 and was properly found not to be acceptable by the DSA."

These proposals were thereafter adopted by the Acting Assistant Secretary for Manpower and Reserve Affairs,[6] and approved by the Director of the Office of Federal Contract and Compliance Programs as required by the regulations. See Defense Supply Agency Regulations No. 5500.7, 32 C.F.R. Part 1281 and 41 C.F.R. 60–1.-26(b)(2)(vi).

Timken advances a number of theories in support of the relief requested. The first is that the subject Decision and Order is arbitrary, capricious, and an abuse of discretion, and not supported by substantial evidence.

Unquestionably the final decision of D.S.A. is subject to review by this Court

---

6. The Acting Assistant Secretary was apparently acting for the Director of D.S.A.

under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* See *Commercial Envelope Mfg. Co. v. Dinlop,* 10 E.P.D. ¶ 10.252 (S.D.N.Y.1975). See also *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Scanwell Laboratories, Inc. v. Schaffer,* 137 U.S. App.D.C. 371, 424 F.2d 859 (1970). The standard of review ·in these cases is set forth in Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706, which provides that a "reviewing court shall . . hold unlawful and set aside agency action, findings, and conclusions" found not to meet six separate standards. As stated by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 413–414, 91 S.Ct. at 822, 28 L.Ed.2d at 151–152,

> "*In all cases* agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements." (Emphasis added.)

It is clear, therefore, that the subject Decision and Order must pass muster under this standard. Additionally, as unequivocably indicated by the Supreme Court in *Camp v. Pitts,* 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), the fact of a complete administrative record also requires application of the substantial evidence standard.

■ The Supreme Court has also established guidelines as to what constitutes substantial evidence. "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N. L. R. B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126, 140 (1938). See also *Consolo. v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Miracle v. Celebrezze,* 351 F.2d 361 (6th Cir. 1965); *Ginsburg v. Richardson,* 436 F.2d 1146 (3rd Cir. 1971). However, the reviewing court must consider the record as a whole and is not precluded "from setting aside a . . . decision when it cannot

conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the [agency's] view." *Universal Camera Corp. v. National Labor Rel. Bd.,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456, 468 (1951).

■ The touchstone of review in this action must be Executive Order No. 11246, as amended. Said Executive Order proscribes discrimination· in employment matters by government contractors. It also requires such contractors to take "affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin." Section 202(1). Section 201 of the Executive Order delegates to the Secretary of Labor the authority to promulgate rules and regulations for its enforcement. The Executive Order and the regulations promulgated thereunder have the full force and effect of law. See *Contractors Ass'n of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159 (3rd Cir.), cert. den. 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Legal Aid Society of Almeda County v. Brennan,* D.C., 381 F.Supp. 125 (1974).

■ The Secretary of Labor has promulgated regulations for the enforcement of the Executive Order. Revised Order No. 4, 41 C.F.R. § 60–2, requires a contractor to use the "immediate labor area" or the "labor area surrounding the facility" to define the relevant labor area to be used for computations for the development of an AAP. On August 8, 1973, Phillip J. Davis, Director of the Office of Federal Contract Compliance, Department of Labor, issued a statement explaining that those "terms referred to the local area within which the contractor can reasonably expect people to commute." This interpretation has been enforced by the only reported decision on the subject. See *Legal Aid Society of Almeda County v. Brennan, supra.* Administrative interpretations of regulations are given great deference by the courts. See *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d

616, reh. den. 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965); *Lawson Milk Co. v. Freeman,* 358 F.2d 647 (6th Cir. 1966).

As only the second charge advanced in the June 10, 1974 complaint was resolved adversely to Timken, only that portion of the decision will be reviewed herein.

 D.S.A. resolved this issued by concluding that Timken is in violation of the Executive Order because it failed to include Mansfield's population in the statistical base for the proposed AAP. The basis for this decision was the finding that Bucyrus is within a reasonable commuting distance from Mansfield. However, as indicated above, the correct standard to be applied in this case, as defined by Davis' August 8, 1973 statement, is "the local area within which the *contractor can reasonably expect* people to commute." (Emphasis added.) The difference between these standards is more than semantic, for while a determination of what is a reasonable commuting distance is evidence of where a contractor can reasonably expect people to commute, other evidence may indicate that local practices and customs are to the contrary. Yet this additional evidence is not necessarily relevant to what is a reasonable commuting distance. An administrative decision based upon an erroneous legal standard cannot stand. See *Securities and Exchange Comm'n. v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

Assuming, however, that the D.S.A.'s finding that Bucyrus is within a reasonable commuting distance from Mansfield implicitly applies the correct test, the Court finds that said determination is not supported by substantial evidence.

With the proper test in mind, analysis of the evidence will begin with the grounds advanced by the final Decision and Order for the assumed implicit finding that Timken can reasonably expect Mansfield residents to commute to its Bucyrus plant. As stated by the court in *Trailways of New England v. C. A. B.,* 412 F.2d 926 (1st Cir.

1969), " . . . nothing is clearer than the principle that we examine the [Agency's] reasons and not the subsequent rationalizations of its counsel." The expressed reasons for this conclusion, as quoted above, are: (1) Mansfield is relatively close to Bucyrus, about 25 miles and 35–45 minutes driving time; (2) the relatively small minority population in Crawford County while there is a relatively larger minority population a short distance away in Mansfield; and (3) Timken's 15 mile hiring range is itself an arbitrary determination.

 Clearly distance and travel time are relevant considerations; but this information, by itself, does not indicate what people actually do. The relative minority populations of Mansfield and Bucyrus are totally irrelevant to either what is a reasonable commuting distance or what Timken can expect. The sole relevance of this evidence is in determining what direction the recruiting range should be expanded, once it is decided that such a course is required. Similarly, the supposed "arbitrary" nature of Timken's hiring area presupposes that Timken can reasonably expect significant number of people from beyond this area to seek employment in Bucyrus. It is clear that these "facts" do not constitute substantial evidence. However, defendants argue that other evidence, when taken in conjunction therewith, satisfies this standard. In support of this contention, defendants point to the following: (1) a substantial number of people commute daily from Bucyrus to Mansfield;[7] (2) a substantial number of Timken employees reside outside Timken's hiring area; (3) approximately 10.1% of the employed Richland County residents work outside their county of residence; and that 7.6% of Mansfield residents work outside their county of residence; and (4) that Timken receives applications from persons residing outside its hiring area.

However, these facts do not stand scrutiny, for, at best, they are poor evidence that

---

7. There is also evidence relating to the number of Crawford County residents working in Richland County generally.

Timken can reasonably expect Mansfield residents to commute to its facility. The number of people commuting from Bucyrus to Mansfield does not indicate that the reverse will be true. In fact, in view of the evidence which will be discussed below, such evidence is supportive of the contrary proposition.

The Timken employees residing outside the hiring area comprise approximately 6% of Timken's Bucyrus workers. The evidence shows that these people generally live near to the hiring area, and moved there after being employed. None of these employees reside in Mansfield.

While 10.1% of the employed Richland County residents work in other counties, comparison of the Mansfield Standard Metropolitan Statistical Area (SMSA) to other SMSA's in Ohio indicates that Richland County residents are the least mobile in this respect. Furthermore, this bare statistic does not indicate where these people work. While 7.6% of Mansfield's residents work outside Richland County, only 801 Mansfield residents work in Crawford County. In view of the industrialized nature of the Crawford County cities of Galion and Crestline, and of their location near the Richland County border, the more obvious inference is that the majority of the 801 persons work in or near these cities. This inference is further strengthened by the only direct evidence in the record regarding the number of Mansfield residents working in Bucyrus, which will be discussed below.

The remaining fact assertedly supportive of D.S.A.'s finding relates to applications for employment submitted from persons residing outside Timken's hiring range. The final decision refers to this in additional finding of fact No. 5, which reads as follows:

8. Timken is not included in this figure.

9. The one employer not responding employed approximately 50 persons. One of the twelve who returned the questionnaire did not answer the questions. From the testimony of the Executive Manager of the Bucyrus Chamber of Commerce, it is clear that the largest of the

"For the period January 1, 1972 through May 1, 1973, there were 66 minority applicants for employment at the Timken facility in Bucyrus, the majority of whom lived outside Timken's recruiting area."

First, there is no proof in the record that these applicants resided in Mansfield. In fact, the only evidence that Timken has ever received applications from Mansfield residents is the testimony of its personnel director that "a few" of the applications he saw so originated. Furthermore, even assuming that all sixty-six (66) applicants resided in Mansfield, which is clearly not the case, this is only 0.12% of Mansfield's approximately 55,000 person population, which figure does not even include the persons residing in Mansfield's suburbs. Clearly such minute numbers are not sufficient to warrant a finding that Timken can reasonably expect people to commute to its facility from Mansfield; in fact, these figures are supportive of the opposite conclusion.

On the other hand, significant evidence indicates that Mansfield residents do not commute to Bucyrus in any significant numbers. For example, Timken introduced into evidence an informal survey conducted by the Executive Manager of the Bucyrus Chamber of Commerce. Of the thirteen major employers in Bucyrus,[8] employing a total of approximately 2,809 persons, twelve responded.[9] None of the responding employers had hiring range restrictions; yet there were only four Mansfield residents reportedly employed. Considering that the population of Mansfield is approximately 55,000 persons, the percentage of said population directly shown to commute to Bucyrus is clearly infinitesimal. Even recognizing the limited statistical value of this survey, the fact remains that its results are the only direct evidence in the record of Mans-

Bucyrus employers polled did respond; assuming therefore that it was the second largest employer who failed to respond, and as said employer employs approximately 395 persons, then it may safely be assumed that the results of said survey accurately reflect the employment status of slightly less than 2300 persons.

field residents' commuting habits to Bucyrus. Not only is this the ultimate question which was presented for decision, but further the results thereof strenghten the inference that the vast majority of the 801 Mansfield residents employed in Crawford County work in Crestline and Galion, which are quite near the Richland County line.

The government argues that Timken's restrictive hiring policy may be a cause of the extremely small number of persons commuting daily from Mansfield to Bucyrus. However, in view of the nearly 2300 other jobs offered by major employers in Bucyrus without any hiring restrictions, said argument is found to be speculative and conjectural.

▆ Upon examination of the record the Court concludes that the only real evidence supportive of the finding that Timken could reasonably expect Mansfield residents to commute to its Bucyrus plant are the facts that Mansfield is approximately 25 miles away and that it would take 35 to 45 minutes travel time. Clearly this evidence is not itself conclusive, as the populations' habits may, and in this case clearly do, indicate that Mansfield tends to draw employees from surrounding areas, not export them. The Court concludes both that the record does not contain substantial evidence supportive of the Director D.S.A.'s conclusion on this issue, and that the record clearly supports the contrary proposition.

▆ The government also argues that the administrative finding that Timken's hiring area is itself discriminatory also demonstrates a violation of the Executive Order, and that said determination is supported by substantial evidence.[10]

As previously indicated, only two grounds were charged in the June 10, 1974 complaint: (1) that Timken hired non-minorities residing outside its hiring area while refusing to hire similarly situated minorities; and (2) that Timken's AAP was predicated upon an insufficient statistical base because it failed to include Mansfield in its recruiting range. The first charge was re-solved in favor of Timken, and the second was resolved adversely to Timken. However, the record contains no formal notice to Timken that this third, new charge had been leveled against it. On the contrary, the hearing was specifically directed toward resolution of the two charged violations. To permit this *ad hoc* justification would raise substantial due process questions. Yet, the Court need not address this problem, as it finds that said conclusion is not supported by substantial evidence.

The government argues that the utilization of this hiring area has an adverse effect on minorities in that all the minorities living in Mansfield are thereby excluded from consideration for employment. As D.S.A. found no business justification for such a hiring radius, the argument continues, said practice constitutes a discriminatory employment practice under both the Executive Order and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. See *Griggs v. Duke Power Company,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158.

Closer examination reveals, however, that this finding is expressly predicated upon the earlier finding that Mansfield residents live "within a reasonable commuting distance." The Court expresses grave reservations about the utility of this standard. A more accurate formulation of the issue would, again, include reference to actual population habits, for unless a reasonably substantial proportion of Mansfield's residents would commute to Bucyrus, any potential adverse impact is not realized, and the actual effect would be commensurate to that upon the populations of Cleveland, New York, or Los Angeles. As the Court has previously found that the evidence clearly demonstrates that Mansfield residents do not commute to Bucyrus, the Court finds that this conclusion of law cannot stand.

In view of the foregoing determinations, the Court concludes that is unnecessary to address the remaining contentions advanced by Timken.

---

**10.** See D.S.A.'s conclusion of law No. 7 *supra.*

Defendants have filed a counterclaim. Essentially, said counterclaim asserts the findings contained in D.S.A.'s Decision and Order, and seeks injunctive relief enforcing said Decision and Order. For the reasons stated above, the Court finds said counterclaim meritless.

Accordingly, the final Decision and Order of D.S.A. debarring Timken from eligibility for government contracts is hereby reversed and vacated. As the evidence indicates that Timken is in compliance with Executive Order No. 11246, the Court finds further administrative procedures unnecessary and judgment shall be entered for Timken herein.

IT IS SO ORDERED.