JOHN N. BRUNSFELD & SONS, INC., Plaintiff-Appellee, *v.* THE BOARD OF EDUCATION OF THE CITY OF CHICAGO *et al.*, Defendants.—(THE BOARD OF EDUCATION OF THE CITY OF CHICAGO, Defendant-Appellant.)

First District (2nd Division)    No. 76-334

Opinion filed October 25, 1977.

Michael J. Murray, of Chicago (Richard E. Girard and Edward C. Peterson, of counsel), for appellant.

No brief filed for appellee.

Mr. JUSTICE PUSATERI delivered the opinion of the court:

This appeal presents the issue of whether a bidder for work to be performed for the Board of Education of the City of Chicago, a body politic and corporate, has met the requirements of compliance with applicable Federal and State Equal Employment Opportunity laws, and Fair Employment Practice laws, and specifically has submitted an acceptable written affirmative action program (Pre-Award Survey) to assure compliance with the Board of Education's equal employment opportunity guidelines.

Plaintiff, John N. Brunsfeld & Sons, Inc., an Illinois corporation, filed a two count amended complaint seeking injunctive relief. Count I was against the defendant Board of Education of the City of Chicago (hereinafter "Board"), and alleged that plaintiff was the low bidder on contracts for roofing repairs at four schools (Blaine, Magellan, Moseley, and Thomas Schools), and that on being advised that it was the low bidder, it took the necessary steps to prepare for the beginning of work as stated in the Board's proposals for bids. Subsequently, plaintiff was notified by the Board's director of equal employment opportunity that its bids were not being accepted because it had not complied with the Board's affirmative action program.

Count I prayed for a temporary restraining order prohibiting the Board from ratifying and affirming any contract for the roofing work, a preliminary injunction enjoining the Board from ratifying and affirming any contract for the roofing work with any party other than plaintiff, a permanent injunction ordering the Board to ratify and affirm plaintiff's proposals as low bidder, and an order directing the Board to vacate any ratification or affirmation of any contract pursuant to any proposals submitted by any party other than plaintiff.

Count II was against the defendant Norton Sons Roofing Company (hereinafter Norton), and alleged that Norton was the second lowest bidder as to the Moseley School, and that Norton was awarded the contract for roofing repairs at that school. Count II prayed for a temporary restraining order and a permanent injunction prohibiting Norton from performing any construction work upon the Moseley School, and for an order directing the Board to revoke its ratification and

affirmation of Norton's proposal, and award the Moseley School contract to plaintiff.

After a trial on the merits, the trial court entered an order which permanently enjoined the Board from awarding any contract for roofing repairs to Norton under the August 15, 1975, proposals for bids on the Blaine, Magellan, and Thomas schools and permanently enjoined Norton from performing any construction work upon the Moseley School under the contract awarded by the Board, pursuant to the request for bids for roofing repairs of August 15, 1975.

The defendant Board appeals from the portion of the order pertaining to it, contending that the extraordinary relief of injunction was improperly granted where the plaintiff failed to submit an acceptable "Affirmative Action Pre-Award Survey." Defendant Norton has not appealed.

■■ We do not have the benefit of a brief on behalf of plaintiff. Our supreme court has stated, "However, the judgment of a trial court should not be reversed *pro forma* for the appellee's failure to file its brief as required by rule. A considered judgment of the trial court should not be set aside without some consideration of the merits of the appeal." (*First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63 Ill. 2d 128, 131, 345 N.E.2d 493.) We thus address ourselves to the merits of the appeal.

On November 10, 1971, the Board, pursuant to its statutory rule-making power (Ill. Rev. Stat. 1973, ch. 122, par. 34—19), adopted as its policy the requirement that each Board contractor must comply with all applicable laws requiring equal employment opportunity and fair employment practices. On August 23, 1972, the Board again exercised this power and established the requirement that contractors must submit an acceptable written affirmative action program (hereinafter "acceptable program") with their bid proposal and adopted the policy that the successful bidder would be awarded the contract only if he had an acceptable program. Equal employment opportunity guidelines (hereinafter "Guidelines") were adopted by the Board on April 25, 1973, to be used as objective standards in the determination of whether an affirmative action program (hereinafter "program") was "acceptable."

In August, 1975, the Board advertised for bids for roofing work to be performed at the four aforementioned schools, as per the statutory provisions requiring it to utilize the competitive bidding process in awarding the contracts in question and to award each contract to the "lowest responsible bidder" of those participating in the competitive bidding for each contract. (Ill. Rev. Stat. 1973, ch. 122, pars. 34—21.3, 10—20.21.) With the proposal form and bid specifications sent to prospective bidders, there was included an "Affirmative Action Pre-

Award Survey" (hereinafter "Survey"), which provided in pertinent part:

"As a condition precedent to consideration and/or acceptance of any bid by the Board of Education, each bidder must submit with his bid a written affirmative action program demonstrating his compliance with Board of Education policy and Federal, State and Local laws requiring equal employment opportunity in all aspects of employment irrespective of race, color, religion, sex or national origin."

The Survey also provided in language almost identical to that contained in the Board's Guidelines:

"An acceptable affirmative action program must include an analysis of areas within which the contractor is deficient in the utilization of minority groups and women; and further, where deficiencies exist, goals and timetables to which the contractor's good faith efforts must be directed and, thus to increase materially the utilization of minorities and women at all levels and in all segments of his work force."

The Survey submitted to each contractor fully included an "Employment Practices Report" form, an "Affirmative Action Plan" form, a "Certification As To Equal Employment Opportunity," and a "Certification of Nonsegregated Facilities."

Mr. Louis J. Barnes, Director of Equal Employment Opportunity for the Board, testified that it was his job to interpret the surveys submitted by bidders. In determining whether the lowest bidder has an underutilization of minority workers in his work force, he computes the percentage of minority workers in the contractor's total work force by referring to the "Employment Practices Report" form, which provides data regarding the number of employees (as the most recent payroll period) employed in various job classifications, and the race and sex of each employee. He testified that for the year 1975, a contractor's total work force had to be comprised of at least 18 percent minority workers as per the Guidelines, or it would be deemed underutilized. If no underutilization was found, then the contractor's Survey would be his acceptable program, and the contractor would not have to set goals and timetables in the "Affirmative Action Plan" form included in the Survey. However, as work progressed, this contractor would be monitored to insure his continuing utilization of a minimum of 18 percent minority workers; he would be subject to on-site inspections and be required to file status reports.

If an underutilization was found, the number of minority workers the contractor intended to hire as indicated in the "Goals and Timetables" portion of the "Affirmative Action Plan" form, combined with the number of minority workers he presently employed, would have to meet or

exceed the requisite 18 percent to constitute an acceptable program. The "Goals and Timetables" portion of this form requests the contractor to indicate: (1) the numbers of non-whites he would hire; (2) in what job categories; (3) by what target date. As work progressed, this contractor would be monitored to determine whether he was making a "good faith effort" to comply with his goals and timetables.

In early September 1975, plaintiff submitted his Survey along with his sealed bids for the roofing work to be performed at the four aforementioned schools. Mr. Barnes reviewed the plaintiff's Survey and issued an opinion "Survey in non-compliance; do not award contract." He testified that the specific reasons for the decision of non-compliance and disapproval of the plaintiff's program as submitted was the underutilization of minority workers in plaintiff's work force, and plaintiff's failure to set goals and timetables designed to overcome the underutilization.

Mr. Barnes further testified that plaintiff had 11 employees, one of whom was a minority. He recognized that plaintiff, in the "Goals and Timetables" portion of the "Affirmative Action Plan" form, had indicated "16-20% of Journeyman Labor Force, as requirements dictate." Mr. Barnes testified that this language did not indicate a certain target date or specific time which could be monitored, and "* * * we had asked for numbers, and the percentages are misleading, especially when there are no job categories indicated."

Based primarily on the recommendation of Mr. Barnes, the Board of Education made a determination that the plaintiff's Survey was not in compliance and rejected the plaintiff's bid. The Board now contends that the trial court erroneously interfered by injunction with the Board's statutory discretion to so reject the plaintiff's bid. Ill. Rev. Stat. 1973, ch. 122, pars. 34—21.3, 10—20.21.

In making its determination in this case, the trial court reasoned that the important consideration was that if the plaintiff presented a program which would bring it in compliance, then it was eligible to have the contract awarded to it, and that it was sufficient for plaintiff to submit a program which said "I will bring this up to sixteen to twenty percent or even more as dictated," and furthermore that the fact that plaintiff did not submit a date should not disqualify it, for "* * * it should be obvious to anybody that the date by which he would do it is when he would be undertaking the contract * * *." We do not concur with the trial court's conclusion in this regard.

■■ That a public body such as a board of education may require successful bidders to comply with affirmative action equal opportunity guidelines as one of the terms and conditions of awarding public contracts is well established under Federal and State holdings. *Weiner v.*

*Cuyahoga Community College Dist.* (1969), 19 Ohio St. 2d 35, 249 N.E.2d 907, *cert. denied* (1970), 396 U.S. 1004, 24 L. Ed. 2d 495, 90 S. Ct. 554; *Rossetti Contracting Co., Inc. v. Brennan* (7th Cir. 1975), 508 F.2d 1039; *Associated Gen. Contractors of Mass., Inc. v. Altshuler* (1st Cir. 1973), 490 F.2d 9, *cert. denied* (1974), 416 U.S. 957, 40 L. Ed. 2d 307, 94 S. Ct. 1971; *Southern Illinois Builders Association v. Ogilvie* (7th Cir. 1972), 471 F.2d 680, *aff'd* (S.D. Ill. 1971), 327 F. Supp. 1154; *Contractors Association v. Secretary of Labor* (3d Cir. 1971), 442 F.2d 159, *cert. denied* (1971), 404 U.S. 854, 30 L. Ed. 2d 95, 92 S. Ct. 98.

*Ogilvie* is one of the leading cases on the issue of the propriety of requiring affirmative action plans as a condition of the award of public construction contracts. There the District Court found that governmental bodies had a legitimate purpose in seeking to overcome the effects of past discrimination in the construction industry, and specifically the court stated:

> "* * * Discriminatory practices have taken place, and something must be done in order to rectify the situation. Such practices must be eliminated by responsible and responsive governmental agencies acting pursuant to the best interests of the community. * * *" (327 F. Supp. 1154, 1159.)

In determining the propriety of including a requirement that contractors for public work commit themselves to an acceptable affirmative action program, the court stated:

> "As part of the terms and conditions of a contract, contractors who perform work on federal assisted projects must adopt affirmative action programs designed to guarantee equal employment opportunities for members of minority groups. If the Government has developed the Plan, as here, the contractor who is performing work pursuant to a contract where public money is involved, is bound by the terms and conditions of the affirmative action program." (327 F. Supp. 1154, 1161.)

In approving the "Ogilvie Plan," the Court of Appeals for the Seventh Circuit sustained regulations of the Secretary of Labor substantially similar to the Board's requirements that contracts specify goals and timetables. The court concluded:

> "The obligation to take affirmative action imports more than the negative obligation not to discriminate. * * * The Secretary's regulations require that contractors develop written affirmative action plans which shall 'provide in detail for specific steps to guarantee equal employment opportunity keyed to the problems and needs of members of minority groups, including, when there are deficiencies, the development of specific goals and timetables for the prompt achievement of full and equal employment

opportunity.' 41 C.F.R. 60—1.40(a) (1970)." 471 F. 2d 680, 684.

The constitution, statutes and public policy of Illinois are in accord with affirmative action requirements in contracts for public work. Thus, article I, section 17 of the constitution of the State of Illinois clearly prohibits discrimination in employment and the sale or rental of property, and section 4 of the Illinois Fair Employment Practices Act dealing with public contracts prohibits any unfair employment practice in connection therewith (Ill. Rev. Stat. 1973, ch. 48, par. 854). In addition, section 1 of "An Act to prohibit discrimination and intimidation on account of race, creed, color, sex or national origin in employment under contracts for public buildings or public works" (Ill. Rev. Stat. 1973, ch. 29, par. 17) provides:

> "No person shall be refused or denied employment in any capacity on the ground of race, creed, color, sex or national origin, nor be discriminated against in any manner by reason thereof, in connection with the contracting for or the performance of any work or service of any kind, by, for, on behalf of, or for the benefit of this State, or of any department, bureau, commission, board, or other political subdivision or agency thereof."

In a very recent decision, this court considered a controversy involving a situation of similar nature to that in the case at bar. In *Arthur Weil & Co. v. Board of Education* (1st Dist. 1977), 49 Ill. App. 3d 649, 364 N.E.2d 542, the trial court entered an order directing the Board to award a contract on an elementary school to the plaintiff contractor.

The contractor had submitted a sealed bid for the work to be performed. Accompanying the bid was its "Affirmative Action Pre-Award Survey" which the Board had sent to prospective bidders and in which plaintiff had provided information concerning its affirmative action program.

The contractor was thereafter advised that it was the low monetary bidder. However, after reviewing plaintiff's Survey, Mr. Louis J. Barnes, the Board's Director of Equal Employment Opportunity, decided that plaintiff's program was unacceptable. The contractor requested the Director's permission to amend its Survey so as to have it reflect the employment of a minority subcontractor. The Director denied the request. Thereafter, the contractor petitioned for a temporary restraining order preventing the Board from awarding the contract to the next lowest bidder and for mandamus relief compelling the Board to permit the contractor to amend the program, to find its program acceptable, and to reinstate it as a competitive bidder and to award it the contract.

On appeal, this court stated that the record disclosed that the contractor's program did not satisfy all of the Board's acceptable program requirements, and also that the record disclosed no unreasonable or

arbitrary exercise of statutory rule-making power (Ill. Rev. Stat. 1975, ch. 122, par. 34—19) in making the acceptable requirements the contractor did not satisfy applicable to it. In denying the relief sought, the court concluded that:

"* * * In the record before us we find no proof that defendants were under a clear legal duty to award the contract in question to plaintiff and no proof that plaintiff had a clear legal right to receive this contract." 49 Ill. App. 3d 649, 654.

In the instant case, we conclude that the Board had the authority and power to adopt its affirmative action program. The Guidelines of the Board, which are an embodiment of its affirmative action program, require:

"* * *an analysis of areas within which the contractor is deficient in the utilization of minority groups and women, and further, goals and timetables to which the contractor's good faith efforts must be directed to correct the deficiencies * * *."

■■ We find that plaintiff failed to submit an acceptable program, since it failed to set specific goals and timetables designed to overcome the underutilization of minority workers in its work force. Its bid failed to comply with the Board's affirmative action program, and the trial court erroneously interfered by injunction with the discretion reposed by law in the Board of Education. (Ill. Rev. Stat. 1973, ch. 122, pars. 34—21.3, 10—20.21.) In *People v. Omen* (1919), 290 Ill. 59, 67, 124 N.E. 860, our supreme court stated:

"It has been repeatedly held by this court that the statutory requirement that contracts for public improvements shall be let to the lowest responsible bidder does not require the letting of a contract to the lowest bidder upon the ascertainment of his financial responsibility, only; that the term 'responsible' includes the ability to respond by the discharge of the contractor's obligation in accordance with what may be expected or demanded under the terms of the contract, and that when the municipal authorities have exercised their discretion in the award of a contract for a public improvement the presumption obtains that the action of such authorities was regular and lawful, and the courts will not interfere, in the absence of fraud, with the exercise of official discretion by the municipal authorities in awarding such contract. (*Hallett v. City of Elgin*, 254 Ill. 343, and cases cited.)"

■■■ In the case at bar, the defendant Board of Education properly exercised its statutory discretion in awarding contracts to the lowest responsible bidder who submitted an acceptable affirmative action program. Under these circumstances, especially where there is no allegation of fraud, the trial court improperly issued an injunction against

the awarding and carrying out of said contracts. Where the performance of an official act such as the awarding of a contract for public work involves the exercise of judgment or discretion, the courts should not interfere to control or review the exercise of the statutory power vested in the public body.

Accordingly, the judgment of the circuit court of Cook County is reversed.

Reversed.

DOWNING, P. J., and STAMOS, J., concur.