(No. 53535.—

EASTMAN KODAK COMPANY, Appellant, v. THE FAIR EMPLOYMENT PRACTICES COMMISSION, Appellee.

*Opinion filed June 26, 1981.—Rehearing denied October 19, 1981.*

David M. Stahl, Diane Dillon, and John E. Cipriano, of Isham, Lincoln & Beale, of Chicago, for appellant.

Tyrone C. Fahner and William J. Scott, Attorneys General, of Springfield (Moshe Jacobius, Assistant Attorney General, of Chicago, of counsel), for appellee.

MR. JUSTICE WARD delivered the opinion of the court:

This appeal involves a challenge by the Eastman Kodak Company to a decision of the Fair Employment Practices Commission (Commission) which struck Kodak's name from the list of eligible bidders for public contracts with the State of Illinois. The Commission's decision was based upon the claimed failure of Kodak to submit an acceptable affirmative action program to rectify what the Commission considered an "underutilization" of minority employees at Kodak's Oak Brook facility. Kodak filed an appeal under the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) in the circuit court of Du Page County and the court reversed the decision of the Commission. The appellate court in turn reversed the circuit court judgment (83 Ill. App. 3d 215), and we granted Kodak's petition for leave to appeal (73 Ill. 2d R. 315(a)).

As a means of carrying out the declared legislative intention under the Fair Employment Practices Act (Ill. Rev. Stat. 1975), ch. 48, par. 851 *et seq.*) to provide equal employment opportunities to all residents of the State and to protect them from discrimination on the basis of "race, color, religion, sex, national origin, ancestry or unfavorable discharge from military service, or physical or mental handicap unrelated to ability" (Ill. Rev. Stat.

1975, ch. 48, par. 851), section 4 of the Act imposes certain requirements upon individuals or companies who enter into public contracts with State or local governmental bodies. All contractors, subcontractors, and labor unions, as a precondition to a contract, must agree that they "shall not commit an unfair employment practice in this State as defined in this Act [see Ill. Rev. Stat. 1975, ch. 48, par. 853], and shall take affirmative action to insure that no unfair employment practice is committed." (Ill. Rev. Stat. 1975, ch. 48, par. 854.) Section 4A empowers the Commission to "issue rules and regulations, conduct investigations, hold hearings and issue orders based thereon for the purposes of enforcement and administration of Section 4 of this Act and rules and regulations adopted hereunder." Ill. Rev. Stat. 1975, ch. 48, par. 854A.

Under this grant of legislative authority to promulgate rules and regulations to carry out the legislative intent of the Act, the Commission requires a contractor or subcontractor to file a prequalification report with the Commission in order to establish its eligibility for bidding on public contracts. (Rules and Regulations for Public Contracts Prescribed by the Illinois Fair Employment Practices Commission, Art. V, sec. 5.1.) In addition to representing that it will not discriminate on the basis of "race, color, religion, sex, national origin or ancestry," the employer must also ascertain whether minorities and women are "underutilized" within his workforce. (Art. III, sec. 3.1(1) (Nov. 30, 1972).) "Underutilization," with respect to minorities, is defined as "having fewer minority workers in a particular job classification than would reasonably be expected by their availability. The availability of minority workers for any job classification shall be determined by the minority population percentages of the area(s) from which the contractor or subcontractor may reasonably recruit ***." (Art. IV, sec.

4.2(a) (Nov. 30, 1972).) If the Commission determines from a review of the applicant's prequalification report that it is underutilizing the available minority work force, the employer must submit an acceptable affirmative action program. This program must set out the proposed area within which the applicant will actively recruit minority employees, and also the goals, programs, and timetables related to the employer's attempt to increase the percentage of minorities in its work force to a level comparable to the percentage of minorities currently employed within a reasonable recruitment area. If the plan is found acceptable so as to correct the underutilization, the applicant's name will be placed on the list of eligible bidders for public contracts with the State. If the applicant's affirmative action program is found to be unacceptable, the company may be barred from bidding on the contracts on the grounds of noncompliance. Art. III, sec. 3.1; art. V, sec. 5.1(c) (Nov. 30, 1972).

In September of 1974, Kodak filed its prequalification report with the Commission in order to maintain its bidding-eligibility status. The Commission, upon reviewing the statistical information provided by Kodak, found that it was employing minorities to the extent of 11.9% at its Oak Brook plant. Comparing this figure to the 23% minority work force currently employed within the Chicago Standard Metropolitan Statistical Area (SMSA), which is composed of Cook, Du Page, Kane, Lake, McHenry and Will counties, the Commission determined that Kodak was underutilizing minority employees. Kodak did not contest this finding. Instead, it submitted an affirmative action program according to rules and regulations of the Commission. (Art. V, sec. 5.1(c).) The program included a proposed recruitment area which consisted of all of Du Page County and that part of Cook County, excluding the city of Chicago, which extended east to Harlem Avenue, north to Devon Avenue and south to 95th Street. Of the total

percentage of estimated employees within this area, minority employees comprised 4.3%. Kodak's facility was located seven miles from the proposed area's eastern boundary and 17 miles from the western boundary. As stated, no part of the city of Chicago was included in Kodak's recruitment area.

An examination of Kodak's employment records for the first half of 1975 with respect to employee residences, which were grouped on the basis of zip codes, gender, and race, and of Kodak's employment-application records disclosed that 47% of its employees resided outside its proposed recruitment area and that 19% of its total number of employees lived in Chicago. The Commission also found that 40% of Kodak's applicants lived outside the recruitment area; that for the same period of time, the first half of 1975, 26% of these applicants were from minority groups and that 13% of the total of applicants resided in Chicago. On the basis of these findings, the Commission concluded that Kodak's proposed recruitment area was unreasonable considering the significant percentage of employees and applicants who lived outside this area.

The Commission on October 15, 1975, issued an order of noncompliance based on what it termed Kodak's failure to submit an acceptable affirmative action program. The program was unacceptable, the Commission decided, because of an unreasonable recruitment area and because of Kodak's stated goal to recruit and hire minority employees at a rate of only 5%.

Under the Commission's rules, Kodak requested a public hearing before an administrative hearing officer. At this proceeding, the Commission, in support of its position that Kodak's proposed recruitment area was unreasonable, introduced into evidence various maps outlining the Chicago SMSA and the area submitted as Kodak's recruitment area; that portion of the 1970 SMSA census figures showing the relation of the black and

Spanish populations to the population as a whole; an applicant flow chart and employment chart prepared by Kodak when it filed its prequalification report; and, finally, a map of Chicago and suburbs which indicated the residences of Kodak's current employees and the applicants for employment.

Kodak, in the proceeding before the hearing officer, did not contest the accuracy of the employment statistics or the evidence presented by the Commission. Instead, it called two expert witnesses. The first, Byrne Underhill, is Kodak's national corporate coordinator for equal employment programs. He described Kodak's local efforts in encouraging applications and referrals of prospective minority employees through various urban and suburban minority organizations. He said that while Kodak has been particularly successful with such organizations in the Maywood area, it did not have favorable results with the Chicago Urban League and stated that Kodak no longer works with the league in trying to attract minority employees. It appeared that this was one factor in Kodak's decision not to include the city of Chicago in drawing its proposed recruitment area. Underhill was not able to state, however, what number or percentage of its minority employees or applicants it secured through the various minority organizations.

He further testified that the turnover rate of the minority work force at the Oak Brook facility was only 3% in 1975 and that 33% of its new hirees in that year were minorities. In response to a question as to why close to 20% of its employees are willing to travel from Chicago to Oak Brook, Underhill offered as explanation the "fact" that a significant number of these individuals had worked with Kodak in Chicago before it relocated in Oak Brook and did not wish to forfeit employment benefits which had accrued. The record reveals, however, that only 6 of the 28 affected employees decided to relocate. Approxi-

mately 100 of Kodak's employees in 1975 resided in Chicago.

When asked why the city of Chicago was not included in Kodak's recruitment area, the witness cited the lack of recruitment success through the Chicago Urban League and also expressed the opinion that to actively seek prospective minority employees in Chicago as well as in other areas in the SMSA would dilute their overall effectiveness in recruiting, particularly in the Maywood area. Underhill also raised the point that of Kodak's 528 employees, which, excluding salespersons, are subject to a Federal affirmative action program, 350 were locally recruited, whereas the remaining number of employees had been the subject of a national search. The significance of this employment statistic is Kodak's argument that of these local employees, 18.2% were minorities who served principally in clerical and service-oriented positions and who in 1975 were paid entry-level salaries of between $150 and $175 per week. It was Kodak's position that only the 350 locally recruited employees should be included in any statistical employment analysis of its hiring practices. The apparent implication was that nationally recruited employees are more apt to live farther from the Oak Brook facility than its locally recruited employees do. Kodak did not provide, however, any evidence as to where the employees hired as a result of national recruiting actually resided.

Melvin W. Reder, a professor of urban economics at the University of Chicago, also testified for Kodak. The purpose of Professor Reder's testimony, supported to some extent by SMSA statistics from the Chicago area, was to establish that the greater the distance a jobsite is from an employee's residence, the less likely that employee is willing to travel to the site of employment or be able to arrange to travel to work in a car pool. This position was then applied to Kodak's location and its distance from

Chicago in order to describe the attendant "problems" of traveling to and from Chicago to the Oak Brook plant.

To support the recruitment area plan it had proposed, Kodak also introduced, at the administrative hearing, a study compiled by Laplois Ashford, executive director of the Chicago Urban League, and one prepared by the Northwestern Indiana Regional Planning Commission. Both reports examined travel patterns by car and mass transportation, and the first was directed toward the impact upon members of minorities who must travel to the suburbs for employment.

Kodak first contends that the rules and regulations promulgated by the Commission exceeded its statutory grant of authority. Specifically, Kodak claims that the Commission may take "affirmative action" only to insure that no unfair employment practice is committed against an individual. The Commission cannot, it argues, require a company to submit an affirmative action program to correct what is claimed to be an underutilization of minorities as a class.

We have described the legislative intent underlying the Fair Employment Practices Act and the Commission's role in enforcing the policy of insuring that no party to a public contract with the State or other public body is guilty of what the Act proscribes as an unfair employment practice (Ill. Rev. Stat. 1975, ch. 48, par. 851 *et seq.*). While an agency may not issue regulations which exceed or alter its statutory power (*Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147, 151) or which are contrary to the legislative purpose and intent of the statute (*People ex rel. Illinois Highway Transportation Co. v. Biggs* (1949), 402 Ill. 401, 409), an administrative agency has authority to regulate and execute the provisions of the statute and to carry out the powers conferred upon it. (See *Hill v. Relyea* (1966), 34 Ill. 2d 552,

555; *Owens v. Green* (1948), 400 Ill. 380, 398.) Further, the promulgated rules and regulations will be presumed to be valid and to have the force and effect of law. *Northern Illinois Automobile Wreckers & Rebuilders Association v. Dixon* (1979), 75 Ill. 2d 53, 58, citing *DeGrazio v. Civil Service Com.* (1964), 31 Ill. 2d 482, 485; 2 Am. Jur. 2d Administrative Law sec. 298 (1962); *People ex rel. Colletti v. Pate* (1964), 31 Ill. 2d 354, 359.

Applying this to the case here, there is nothing to support the claim that the Commission has exceeded its statutory authority or that the rules and regulations adopted by it to enforce and execute legislative policy with respect to public contracts are in "clear contravention of the spirit and letter of the act" as to make them unlawful. (*Ruby Chevrolet, Inc. v. Department of Revenue* (1955), 6 Ill. 2d 147, 151.) Specifically, we find no merit to Kodak's claim that the term "affirmative action," as it is used in section 4 of the Act, is limited in its application to individual acts of discrimination in employment. Section 4 requires that "[e]very contract to which the State, any of its political subdivisions or any municipal corporation is a party shall be conditioned upon the requirement that the supplier of materials or services or the contractor and his subcontractors, and all labor organizations *** shall not commit an unfair employment practice in the State *** *and shall take affirmative action to insure that no unfair employment practice is committed.*" (Emphasis added.) (Ill. Rev. Stat. 1975, ch. 48, par. 854.) Though the statutory definition of an "unfair employment practice" proscribed under the Act is directed to acts of discrimination against an individual (Ill. Rev. Stat. 1975, ch. 48, par. 853), Kodak's argument suggests that such practices are never directed towards a class of individuals. Under the construction Kodak urges for "affirmative action" the Commission would be barred from adopting rules which would pro-

hibit discriminatory actions or conduct against minority groups as a precondition to bidding on public contracts. Certainly the legislature never intended to withhold from the condemnation of the Act practices directed against a class or classes of individuals because of their race, origin, sex, color, or religion. Kodak cites no authority for what would be an absurdly narrow construction of "affirmative action." Where "affirmative action" has been used in the context involved here, it has been interpreted in both Federal and State decisions to refer to programs with goals and timetables and other means designed to secure and guarantee equal employment opportunities to members of minority groups. See, *e.g., Fullilove v. Klutznick* (1980), 448 U.S. 448, 65 L. Ed. 2d 902, 100 S. Ct. 2758; *City of Minneapolis v. Richardson* (1976), 307 Minn. 80, 85, 239 N.W.2d 197, 205; 41 C.F.R. sec. 60—1.40(a) (1980); Nash, *Affirmative Action Under Executive Order 11,246,* 46 N.Y.U. L. Rev. 225, 233 (1971).

This court, in a recent decision, approved of an affirmative action plan adopted by the Public Building Commission which awarded a public contract to the Del E. Webb Corporation to construct the New Loop and City Wide College in Chicago on the basis of a canvassing formula which awarded certain "credits" to bidders based upon the number of labor hours contributed by minority employees. In *S. N. Nielsen Co. v. Public Building Com.* (1980), 81 Ill. 2d 290, the Webb Corporation had been awarded the contract through application of this formula despite the fact that it had not submitted the lowest bid. The court rejected the contention that the Commission had exceeded its legislative authority in applying the canvassing formula and held that under section 4 of the Fair Employment Practices Act (Ill. Rev. Stat. 1975, ch. 48, par. 854) the Public Building Commission was "authorized to implement affirmative action requirements in the letting of its contracts 'to *insure*' that no discrimination is prac-

ticed against minorities in employment decisions." (81 Ill. 2d 290, 297, citing *John N. Brunsfeld & Sons, Inc. v. Board of Education* (1977), 54 Ill. App. 3d 119, 123-25, and cases cited therein.) The Commission here did not exceed its authority in requiring Kodak to submit a reasonable recruitment area and an affirmative action program following a determination by the Commission that Kodak was underutilizing minorities at its Oak Brook facility.

Kodak contends, too, that the effect of the Commission's rules is to force Kodak to engage in impermissible preferential hiring. Though the Commission concluded that Kodak was underutilizing minorities, a charge which Kodak did not contest, by comparing the 11.9% minorites at its Oak Brook facility to the 23% minority work force in the Chicago SMSA, this does not mean, as Kodak claims, that it must now hire a sufficient number of minority employees to reach the 23% figure. As the matter stands, Kodak has been stricken from the list of eligible bidders because it failed to submit a reasonable recruitment area. The Commission has not forced Kodak to adopt the Chicago SMSA as the only area acceptable as reasonable; nor has it compelled or ordered Kodak to hire minority employees. As a result, those questions raised by Kodak with respect to impermissible quotas and claimed violations of title VII of the Civil Rights Act of 1964 (42 U.S.C. sec. 2000a *et seq.* (1976)) are not before us.

Kodak next contends that the administrative hearing officer erred in stating that it bore the ultimate burden of persuasion, and, as a result, it had to "produce evidence to persuade *** [her] and ultimately the Commission itself, that its own recruitment area [was] more reasonable than the Commission's designation of the recruitment area." Relying upon section 8.01 of the Act, Kodak maintains that the burden properly lies with the Commission to prove the elements of its complaint by "a preponderance

of the evidence." (Ill. Rev. Stat. 1975, ch. 48, par. 858.01.) Arguing that the application of an incorrect standard of proof constituted reversible error, Kodak says that it should be reinstated on the role of eligible bidders for public contracts with the State.

This case, however, does not involve a complaint filed by the Commission against Kodak. Section 8.01 of the Act therefore is not to be applied to determine which party is to bear the burden of proof. When Kodak filed its pre-qualification report, it was applying for the privilege to bid on public contracts. This was not a right accorded to all companies or individuals. As has been described, one must meet specified requirements before it is placed on the list of eligible bidders with the State. In essence, when Kodak filed its report it was taking the position that it met these requirements. The Commission instead determined that it was underutilizing minorities. Kodak, under the Commission's rules and regulations, was then required to file an acceptable affirmative action program which included the submission of a reasonable recruitment area, goals, and timetables. This court has held that "[t]he - burden of proof is always on the party having the affirmative of a proposition and it abides with him until a final determination of the proposition." (*Bell v. School District No. 84* (1950), 407 Ill. 406, 416. See also *People ex rel. Rusch v. Fusco* (1947), 397 Ill. 468; *General Foods Corp. v. Hall* (1976), 39 Ill. App. 3d 147; *Williams v. Franks* (1973), 11 Ill. App. 3d 937.) It is true that those decisions did not involve administrative proceedings, but the same principle has been held to apply where a party has applied to an administrative agency for a particular privilege or benefit. (See, *e.g.*, *Gourley v. Board of Trustees* (S.D. (S.D. 1980), 289 N.W.2d 251 (disability benefits); *Energy Regulatory Com. v. Kentucky Power Co.* (Ky. App. 1980), 605 S.W.2d 46 (application to purchase additional generating capacity); *Wander Life Tours, Co. v. Liddy* (Iowa

1973), 207 N.W.2d 27 (application for the issuance of a license to sell and distribute fertilizer products).) In filing its application with the Commission to qualify for the privilege of bidding on public contracts, Kodak bore the burden of proof in establishing that it satisfied the Commission's requirements regarding underutilization and affirmative action programs. The hearing officer did not err in declaring that the burden of proof was upon Kodak.

The appellate court erred, Kodak claims, in holding that a reviewing court will not set aside a decision of the Fair Employment Practices Commission unless it is contrary to the manifest weight of the evidence. It maintains that the proper question for review is whether the Commission's decision is supported by a preponderance of the evidence.

There is somewhat unusual phrasing in the Act's statement of the standard of proof to be followed at a hearing on a complaint before the hearing officer. Section 8.01(c) provides that a "determination sustaining a complaint [that an employer has engaged in an unfair employment practice] shall be based upon a preponderance of the evidence." (Ill. Rev. Stat. 1975, ch. 48, par. 858.01(c).) This provides for the standard of proof and not for a standard of review either by the Commission or by a court. Section 8.02(d) states the standard for the Commission's review of the findings of the hearing officer. (Ill. Rev. Stat. 1975, ch. 48, par. 858.02(d).) It provides: "The Commission shall adopt the hearing examiner's findings of fact if they are not contrary to the manifest weight of the evidence." In the case of appeals from an order of the Commission, section 10 of the Act (Ill. Rev. Stat. 1975, ch. 48, par. 860) states that the Administrative Review Act (Ill. Rev. Stat. 1975, ch. 110, par. 264 *et seq.*) shall govern. Section 11 of the Administrative Review Act provides:

> "No new or additional evidence in support of or in opposition to any finding, order, determination or decision of

the administrative agency shall be heard by the court. The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." Ill. Rev. Stat. 1975, ch. 110, par. 274.

This provision has been interpreted as "limit[ing] the function of the reviewing court to ascertaining whether the findings and decisions of the administrative agency are against the manifest weight of the evidence." (*Davern v. Civil Service Com.* (1970), 47 Ill. 2d 469, 471, *cert. denied* (1971), 403 U.S. 918, 29 L. Ed. 2d 695, 91 S. Ct. 2229. See also *Wells Manufacturing Co. v. Pollution Control Board* (1978), 73 Ill. 2d 226, 234; *Basketfield v. Police Board* (1974), 56 Ill. 2d 351, 358.) Thus, in a review by the Commission or by a court the manifest-weight standard is to be applied.

Decisions in the circuit courts and in the appellate court have differed on the question of the standard for judicial review *i.e.,* whether the decision of the Commission was contrary to the manifest weight of the evidence or whether its decision was supported by a preponderance of the evidence. The opinion in *General Electric Co. v. Illinois Fair Employment Practices Com.* (1976), 38 Ill. App. 3d 967, and the majority and concurring opinions in *School District No. 175 v. Illinois Fair Employment Practices Com.* (1978), 57 Ill. App. 3d 979, are illustrative of the differing views which stem in part, at least, from this court's decisions in *Motorola, Inc. v. Illinois Fair Employment Practices Com.* (1966), 34 Ill. 2d 266, and *Olin Corp. v. Fair Employment Practices Com.* (1977), 67 Ill. 2d 466.

We would make it clear that in reviewing decisions of the Commission the court will not reweigh the evidence and decide what is the preponderance of the evidence but will follow the familiar standard for administrative hearings that the decision by the Commission will not be set aside unless it is contrary to the manifest weight of the evidence.

An examination of the record shows that the decision of the Commission here was not contrary to the manifest weight of the evidence. A factor in determining what would be a reasonable recruitment area is to look to, as the rules do, where the employer "might reasonably recruit." (Art. IV, sec. 4.2(a) (Nov. 30, 1972).) To determine that, one reasonably would ascertain the locations from which present employees are commuting. The record shows that close to half of Kodak's employees at Oak Brook live outside of the recruitment area proposed by the company to the Commission as a part of its affirmative action program. Nineteen percent of its employees reside in the city of Chicago, no part of which was included in the recruitment area. Forty percent of the applicants for employment were shown to live outside the suggested recruitment area and 13% of them resided in Chicago. Kodak's attempt to cast a different light upon these undisputed figures does not persuade. It cannot be denied that there is force to Kodak's argument that the distance from and the traveling time between the place of employment and an employee's residence have a direct effect on the rate of absenteeism, tardiness, and even the affinity with his employer and fellow employees, but the fact is that almost half of Kodak's employees do live outside the proposed area.

Kodak cites *Timken Co. v. Vaughan* (N.D. Ohio 1976), 413 F. Supp. 1183, and says, quoting from the opinion, that the most accurate definition of a reasonable recruitment area is " 'the local area within which the contractor can reasonably expect people to commute.' " (413 F. Supp. 1183, 1189.) But it can be seen that the court made reasonableness the key, and *Timken* does not support Kodak's argument that its recruitment area is reasonable. In that case, too, the facts were unlike those here. The court observed that the only means of transportation between the company involved and Mansfield, a city whose

minority population was 15% of its total, was a "comparatively old, two-lane highway which is heavily traveled by both automobiles and trucks." (413 F. Supp. 1183, 1187.) Given the condition of the road and the traveling time involved between the two locations and other factors not present in this case, the court judged that it was not reasonable to expect workers to commute. Here, of course, many roads provide access to Oak Brook.

For the reasons given, we hold that the Commission's decision that Kodak's proposed recruitment area was not reasonable is not contrary to the manifest weight of the evidence.

Accordingly, the judgment of the appellate court is affirmed.

*Judgment affirmed.*