2018 IL App (1st) 171029

SIXTH DIVISION
September 28, 2018

Nos. 1-17-1029 & 1-17-1069 cons.

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE CITY OF COUNTRYSIDE, | ) | Appeal from the Circuit Court of |
| | ) | Cook County |
| Plaintiff and Counterdefendant-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE CITY OF COUNTRYSIDE POLICE | ) | |
| PENSION BOARD OF TRUSTEES, FRANK | ) | |
| BOZZI, KENNETH BRUNKE, BERNARD | ) | No. 12 CH 6727 |
| DUFFY, SUZANNE D'URSO, PAUL MALLON, | ) | |
| ERNEST MILLSAP, LOU MORAVECEK, | ) | |
| JOSEPH PEITRANTONI, GARY SCHWAB, TIM | ) | |
| SWANSON, JOHN MIKEL, MARK BATTAGLIA, | ) | |
| and BRIAN COZEN, | ) | Honorable Jean Prendergast Rooney |
| | ) | and Neil H. Cohen, |
| Defendants and Counterplaintiffs-Appellants. | ) | Judges Presiding. |

PRESIDING JUSTICE DELORT delivered the judgment of the court, with opinion.
Justices Cunningham and Harris concurred in the judgment and opinion.

**OPINION**

¶ 1    This dispute between a city, retired police officers, and the city's police pension board concerns how the officers' preretirement salary increase should be factored into their pension calculations. In summary, the circuit court held that the officers had received more in pension benefits than they were entitled to because their pensions had been incorrectly calculated. The court also rejected the pension board and the retirees' defenses to the city's claim. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    The events giving rise to this dispute began almost 20 years ago. The following chronology and recitation of facts is taken from the pleadings, exhibits, affidavits, and other evidence of record that the circuit court relied on in granting summary judgment. In 2002, the City of Countryside (City) engaged in collective bargaining with the Fraternal Order of Police union (FOP) regarding contracts for the City's police officers, sergeants, and lieutenants. The bargaining resulted in two contracts, one for officers and one for the higher ranks. Both contracts are dated October 24, 2002, and contain the following provision:

> "*Section 14.3: Longevity Benefit*
>
> In addition to the salary amounts set forth in Section 14.1 of this Agreement, eligible officers, employed as of August 1, 2001 and thereafter, shall be paid the following longevity amounts which shall be considered part of the base salary attached to their rank for all purposes: $800.00 effective August 1, 2001; $850.00 effective August 1, 2002. In order to receive this longevity benefit, the following conditions must be met:
>
>> a. The officer must have twenty (20) years of service with the City of Countryside Police Department;
>>
>> b. The officer must be pension eligible, as set forth by statute; and,
>>
>> c. The officer must designate a pay period in which to receive the longevity increase for either of the following two (2) election periods: *January 1st to January 15th*; OR *July 1st to July 15th*;
>>
>> d. In the event the officer fails to select either of the above election periods, the Employer shall issue the longevity stipend on the last payroll

period in December of each calendar year, retroactive to August 1, 2001, for all eligible officers in the bargaining unit as of that date.

The foregoing longevity stipend shall only occur for that payroll period affected and shall not increase the value of any accumulated or accrued benefits of the officer which may be payable." (Emphases in original.)

Furthermore, section 25.1 of the contracts provided an integration clause titled "Complete Agreement." It states as follows:

"The parties acknowledge that during the negotiations which preceded this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining. The understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement."

¶ 4 During the negotiation process, the City's labor attorney sent a memorandum to City officials outlining provisions of the proposed contracts and touting the inclusion of a new "longevity benefit" that would cost the City's pension fund $10,200 per retiring officer annually but save the City itself an estimated $655,347 annually in decreased salary costs because the retirees' lower-seniority replacements would earn far lower salaries than their predecessors. The memorandum states that the $800 or $850 longevity benefit would increase a retiring officer's salary by $20,400 "for pension purposes." The City's general counsel sent a letter to the City's negotiators stating that the City could bargain with the union for more generous pension benefits than those permitted by state law, and, if it did, the pension board would have no choice but to honor the City-union agreement and award pensions based on the negotiated agreement.

3

¶ 5     On October 26, 2002, the City's labor attorney and the FOP's attorney signed a "Letter of Understanding" (Side Letter). It referred to the recent bargaining for new police contracts and, in particular, to the longevity benefit established by section 14.3. The Side Letter stated that it was "RESOLVED" between the FOP and the City "THAT THEY AGREE AND APPROVE" a particular calculation method regarding section 14.3 longevity benefits. Under this method, when an eligible officer took a longevity benefit, the officer's gross wage base for pension purposes would be calculated by multiplying the one-time $800 or $850 longevity benefit times 24 payroll periods, resulting in a final salary for pension purposes that was either $19,200 or $20,400 higher than the officer had actually received in the prior year. The Side Letter provides the following specific example of the calculation method:

> "        $59,717.22     annual wage base
>
> +      $20,400.00     longevity benefit ($850)
>
> =      $80,117.22     base salary upon retirement
>
>         $60,087.91     75% annual pension amount
>
>         $ 5,007.32     monthly pension amount"

Thus, under the example, a single $850 one-time salary increase would increase the officer's annual pension from $44,787.93 (75% x $59,717.22) to $60,087.91—a $15,299.98 annual increase for the rest of the officer's life. This method creates the anomalous result that an officer's annual pension would be higher than any annual salary he had ever actually received during active service. Defendants Frank Bozzi, Lou Moravecek, and Tim Swanson were among those representing the FOP members on the bargaining team, and they all eventually took advantage of this longevity benefit and the Side Letter calculation.

¶ 6    On September 10, 2003, the City adopted a resolution authorizing the mayor and clerk to sign the FOP contracts.[1] Copies of the contracts were attached to the resolution, but neither the resolution nor the contracts adopted or even referenced the Side Letter. The record contains some evidence that certain City officials acquiesced to the new longevity benefit and Side Letter with the understanding that it would be paid only to a few officers who were retiring imminently, and that, after it came to light that the benefit was illegal, it would be discontinued. The City and police union later negotiated successor contracts to the 2003 contracts, each of which contained provisions similar to section 14.3. None of the successor contracts were accompanied by any document similar to the Side Letter. Over time, about 10 retiring officers took advantage of the section 14.3 calculation method and received pensions calculated under the method in the Side Letter.

¶ 7    In 2004, the City's labor attorney wrote to the City's police chief, referencing a May 13 report from Illinois Department of Insurance (DOI) examiners that stated that DOI believed that "increasing 'salary' to inflate pensions and induce retirement is contrary to the Pension Code and actuarially unsound." The labor attorney downplayed concerns about potential illegality of the calculation method, stating that DOI might "be misguided" and emphasizing that the longevity awards had not "been held" to violate the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2004)) and that they remained a contractual obligation between the City and the union. The attorney sent a copy of his letter to the City administrator.

¶ 8    Over time, the City administration changed. A new City finance director, Gail Paul, questioned the legality of the Side Letter computation method. In 2009, the City's labor attorney provided her with a lengthy written opinion concluding that no court had ever specifically

---

[1]Although the FOP contracts are dated October 24, 2002, they were approved by the City in 2003. Thus, we refer to them throughout this opinion as the "2003 contracts."

addressed the issue, and that, at any rate, because the City and the union had bargained and contracted for the calculation method, it "resulted in a vested right by present eligible officers to having the 'longevity benefit' calculated as part of their 'salary' upon retirement." The City's general counsel adhered to his earlier opinion that the calculation was negotiated between the City and the union and that, although "arguments can be made that the Pension Board is not required to be bound by the agreement, should you choose to follow it I feel that there is no grounds to fear liability on your part or the part of the City based on the contractual agreement being negotiated and approved by both parties."

¶ 9      In 2010, the City's labor attorney requested an advisory opinion from the DOI regarding the computation method. In its response, the DOI stated that section 3-125.1 of the Pension Code (40 ILCS 5/3-125.1 (West 2010)) defines salary for pension purposes as "the annual salary, including longevity, attached to the police officer's rank, as established by the municipality's appropriation ordinance." Additionally, the DOI stated, under its administrative regulation interpreting section 3-125.1, when longevity pay is paid in a lump sum, it must be prorated to determine a monthly equivalent. The adjusted monthly salary is then used to compute salary for pension purposes. 50 Ill. Adm. Code 4402.35(d) (1996). Accordingly, the DOI concluded, "only the $850 (1/26th of the annualized increase of $22,100) would be considered pensionable."

¶ 10     A few months later, the attorney for the City of Countryside Pension Board of Trustees (Board) requested an advisory opinion from the DOI regarding the same issue. Unlike its earlier response to the labor attorney, the DOI's response to the Board's attorney specifically mentioned the Side Letter. The DOI reiterated its earlier opinion that the longevity bonus should not be multiplied by 24 and then added to an officer's salary to compute the pensionable salary base. It further stated that the Side Letter had "no bearing" on its interpretation because "[t]he definition

of pensionable salary is codified in state law under 50 IAC 4402 and cannot be superseded by such an agreement."

¶ 11    The City's labor attorney then forwarded the DOI response to various City officials, accompanied by a new memorandum in which he asserted that the DOI's response represented a departure from an earlier DOI position that had upheld the legality of calculation methods such as those set forth in the Side Letter. The attorney offered three options to the City: (1) disregard the DOI and proceed with the present practice; (2) object to the DOI's opinion and seek a declaratory judgment vindicating the City's practice; (3) notify the union that the City would cease using the computation method practice in reliance on the DOI opinion.

¶ 12    In April 2011, the Board's attorney advised the Board that the Side Letter created a binding contract between the City and the union that did not conflict with state law. Accordingly, he stated, "the Board would be on sound legal foundation to include the longevity amount as set forth in the [contracts] as salary attached to rank for calculating pension benefits." He warned that if the Board took contrary action, it "could expose the Board to a state law tort claim for interference with contractual relations."

¶ 13    The Board had routinely retained its own actuary to determine the City's annual funding obligation. Sometime after the City received the DOI correspondence opining that the calculation method was illegal, however, the City retained its own actuary to compute the City's annual obligation to fund the police pension system. The City's actuary based his computations on the assumption that the Side Letter computation method was illegal and that an officer's salary at retirement for pension purposes should be computed by prorating his longevity increase over 24 pay periods rather than annualizing it. The City then began funding the Board at the lower

7

amount computed by its own actuary, rejecting the higher amount suggested by the Board's actuary.

¶ 14    On February 24, 2012, the City filed this lawsuit against the Board and the FOP, seeking declaratory and injunctive relief regarding certain retired police officers' pensions. The second amended complaint at issue here, names the Board, the union, ten retired officers, and the widow of one deceased retired officer as defendants. One of the 11 officers and the union were later dismissed as defendants. During the pendency of this case, the Board continued to provide monthly pensions to the defendants using the Side Letter calculation method.

¶ 15    The eight-count second amended complaint generally alleges that the City was "unaware" that the computation method was illegal and that the Board's use of the Side Letter created a "systemic miscalculation of benefits." Count I seeks a declaratory judgment that the computation method is unlawful. Count II seeks a declaratory judgment that the Board had "systematically miscalculated" the amount the City must contribute to the Board, that the "pension spikes" are not pensionable salary under section 3-125.1 of the Pension Code, and that the City is only required to pay the amount determined by its independent actuary. Count III seeks a declaratory judgment that the City "is properly meeting its funding obligations" to the Board by withholding "any funds that stem from the illegal 'pension spikes' " and an injunction against the Board from requesting that the City fund any pensions stemming from the "pension spikes." Count IV, against the Board and union[2] only, alleges that the Side Letter was never authorized by the City. That count seeks a declaratory judgment that the Side Letter "is of no further force and effect" and injunctive relief enjoining the Board and union from relying on the Side Letter "for any purpose." Count V sought similar relief. Counts VI and VII were eventually

_____

[2]As noted above, the union was later dismissed as a defendant.

withdrawn and are not at issue in this appeal. Count VIII is pleaded against the individual retirees. It seeks a declaration that the computation method is illegal and that the Board "cease making any further payments" which take the "pension spikes" into account. Eventually, both the Board and the retirees answered the amended complaint and pleaded numerous various affirmative defenses.

¶ 16    While the parties litigated the second amended complaint in the circuit court, the City and the union negotiated the terms of a successor police contract to run from 2010 to 2013. The negotiating parties reached an impasse regarding the contractual longevity benefit. That dispute, among others, was submitted to interest arbitration pursuant to section 14 of the Illinois Public Labor Relations Act (5 ILCS 315/14 (West 2010)). Following a prehearing conference, the City filed "jurisdictional objections," asserting that the "pension spike" was not a proper subject of arbitration and therefore fell outside the arbitrator's jurisdiction because it did not relate to "wages, hours and other conditions of employment" under section 7 of the Public Labor Relations Act (*id.* § 7). The City requested that the arbitration be postponed until resolution of the case now before us. Despite the City's objection, the arbitration proceeded to a full evidentiary hearing, the transcript of which is in the record before us.

¶ 17    The arbitrator issued an award on November 22, 2013. The arbitration award recites that the City had made a final offer that section 14.3 of the contract, governing longevity benefits, should read:

> "The City will increase the longevity benefit previously paid of $850.00 per year to $910.00 per year but that benefit will be split evenly and paid across each of the 26 pay periods in a year. Therefore, each pay period, those officers eligible for the longevity benefit will receive $35.00 added to their base salary."

The City's proposed new section 14.3 would have clarified how preretirement longevity increases factored into a retiring officer's pensionable salary and thus would have superseded the contrary provisions of the Side Letter. The parties disputed whether this proposed revision of section 14.3 placed the "pension spike" computation method at issue before the arbitrator. The City argued that its proposal merely set forth "the intent of the parties" regarding the longevity benefit, would provide "clarity," and would "prevent the longevity benefit from being used to increase the value of any other benefit." The City contended that "it was always the intent of the parties that the longevity stipend *** did not increase the value of other benefits." Since the proposal would not, in the City's view, decrease existing benefit, no *quid pro quo* was required to make this change from the existing contract.

¶ 18    According to the award, the union's position at arbitration was somewhat different from the City's. The union characterized the issue as involving how the Board should calculate retirement pensions. The union contended that the Side Letter reflected the parties' agreement regarding pension calculations and that the City's proposal would change the calculation method embodied in the Side Letter. Although the "pension spike" and the matter submitted to arbitration were arguably related to each other, the arbitrator's award adopted the City's position, stating as follows:

> "The 'Pension Spike' issue was specifically excluded from consideration in this
> Interest Arbitration. Here, the Employer advocates for adoption of a proposal that
> would fix the 'Pension Spike.' However, the pension issue is specifically not part
> of the consideration in the instant matter—it formed the basis for the Employer's
> jurisdiction objection."

10

¶ 19    On the merits of the issue submitted, the arbitrator determined that the City's offer was "designed to alter an existing benefit by affecting how pensions are determined." He continued:

> "The Employer's change to the pension calculation is a significant change. Such a significant change requires evidence to support the Employer's position and that evidence is not present in the instant matter. The Employer has specifically advocated for excluding consideration of the 'Pension Spike' in this Interest Arbitration. Without evidence of the effect of the 'Pension Spike,' there is no choice available but to reject the Employer's offer. The Union's offer of Status Quo on the Longevity Benefit is adopted."

Thus, section 14.3 of the contracts remained unchanged following the arbitration.

¶ 20    On February 22, 2013, the City moved for summary judgment on counts IV and V of its second amended complaint. After briefing, the circuit court[3] granted the City's motion and declared the parties' rights as follows: (1) the collective bargaining agreement alone determines the longevity benefit calculation and (2) the Side Letter does not modify the collective bargaining agreement "in any fashion." The court's opinion indicated that the sole issue then before it was whether the Side Letter affected the police contracts and that it was not addressing either the "legality of any alleged pension spikes" or the issue of funding, as those issues were governed by counts I, II, III, and VIII. The court finally noted that the City "conceded at oral argument" that the rights of retirees currently receiving benefits were "not at issue now." Because the court found that those retirees' rights were likely different from those of future

---

[3]Judge Jean Prendergast Rooney presided over this stage of the litigation. After her death, the case was assigned to Judge Neil Cohen. The summary judgment order entered by Judge Rooney is at issue in the appeal before us. For ease of expression, we will refer to this order as "Judge Rooney's" order or opinion.

11

retirees, the court indicated that its ruling applied prospectively only and did "not address or affect those pensioners already receiving benefits."

¶ 21 On April 14, 2014, the defendant retirees and three additional retirees[4] filed a four-count counterclaim that relied on the Side Letter. Count I of the counterclaim alleged that the retirees were third-party beneficiaries of an unidentified contract between the City and the union and that the City breached its obligations to the retirees by not passing an appropriation ordinance covering the salary increase created by the Side Letter. No copy of any particular contract is attached to the counterclaim. Count II of the counterclaim was a claim in *quantum meruit*, alleging that the City had requested services from the retirees[5] and that it was unjust for the City to receive those services without fulfilling its obligation under the Side Letter. In this count, the retirees alleged that the fair and reasonable value of their labor was a minimum of $10,200 annually. Count III of the counterclaim sought declaratory judgments that the City violated its legal obligations to the retirees by not passing an appropriation ordinance covering the benefits created by the Side Letter and that the Board accurately computed the retirees' pensions based on the Side Letter. Count IV of the counterclaim requested a permanent injunction requiring the City to adopt an appropriation ordinance and fund the pension board as required for it to provide the additional benefits payable under the Side Letter.

---

[4]The three additional retirees, Mark Battaglia, Brian Cozen, and John Mikel, retired in 2014 and 2015, somewhat later than the defendants in the original group. The record does not indicate that the three new parties were ever specifically granted leave to intervene into the case. Nonetheless, the circuit court and the parties treated them indistinguishably from the original defendants, functionally making them intervening defendants and counterplaintiffs. We will use the term "retirees" to also refer to this expanded group of defendants-counterplaintiffs and treat them as such.

[5]Defendant Suzanne D'Urso was not a police officer, but received pension benefits as the widow of a retired police officer. Therefore, this count and various pleadings by both parties noted her unique status where appropriate.

¶ 22    The City moved to dismiss all counts of the retirees' counterclaim pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 2014)). On January 26, 2015, the circuit court granted the motion. In his opinion, Judge Cohen specifically noted his agreement with Judge Rooney's earlier opinion and stated that there was no basis to reconsider her order on counts IV and V of the City's amended complaint, which had found that the Side Letter did not govern the retirees' pensionable salary. Based on that finding, he then dismissed the counterclaim with prejudice pursuant to section 2-615 of the Code. The retirees did not file a motion to reconsider that order, a motion for leave to file an amended counterclaim, nor any proposed amended counterclaim. Instead, they stood on the original counterclaim and filed a notice of appeal from the dismissal order. This court dismissed that appeal for lack of jurisdiction because the dismissal order did not contain an order under Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) making it final and appealable.

¶ 23    On May 2, 2016, the Board filed its own counterclaim. Count I sought a declaratory judgment that the City had acted contrary to law by failing to account for the Side Letter's benefits when it provided annual funding to the Board. The Board sought compensatory damages and a declaration that the City was required to levy a property tax sufficient to meet the annual requirements of the pension fund. Count II was a claim in *mandamus* seeking similar relief. The City answered the Board's counterclaim, denying the substantive allegations but also specifically stating that it had not levied any property tax for the Board because it had adequate funds from other sources that it used to periodically meet its statutory funding obligations to the Board.

¶ 24    On August 3, 2016, over a year after the circuit court dismissed the retirees' original counterclaim with prejudice, it granted them leave to file a second counterclaim, over the City's objections. The retirees' second counterclaim did not repeat or reference—in any manner—the

four counts of the retirees' original counterclaim that the court had dismissed with prejudice on January 26, 2015. Instead, the second counterclaim contained a single new count alleging that a controversy existed between the City and the retirees regarding whether the retirees' pensions should be reduced by eliminating the Side Letter computation method. The retirees alleged that the pension protection clause of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5) prohibited the City from diminishing their existing pensions. Again, the City answered, denying the substantive allegations and stating that the Illinois Constitution's protections did not extend to systematic or illegal calculations of pensions such as "those at issue here."

¶ 25    After undertaking discovery and extensive motion practice, the parties filed dispositive motions. On December 13, 2016, the City moved for summary judgment against the Board and retirees on counts I, II, III, and VIII of the City's second amended complaint. The retirees also moved for summary judgment on their second counterclaim. Additionally, the Board moved for summary judgment in its favor. The Board's motion does not specify whether it was presented defensively against the City's second amended complaint, offensively in support of the Board's counterclaim, or both. However, the Board's motion raises a wide range of arguments applicable in both respects.

¶ 26    We note, in passing, that the City filed a legal malpractice lawsuit against the City's original labor attorney in 2014, which expanded to include a third-party complaint against the City's original general counsel. That case proceeded to a jury trial in the law division of the circuit court of Cook County in 2016. The parties in this appeal have presented some evidentiary materials from that trial in support of their motions for summary judgment.

¶ 27    After briefing and argument, the circuit court entered an order (1) granting the City's motion for summary judgment on counts I, II, III, and VIII of its second amended complaint;

14

(2) granting the City summary judgment on the Board's counterclaim and the retirees' second counterclaim; (3) denying the Board's motion for summary judgment; and (4) denying the retirees' motion for summary judgment. This order resolved all pending claims and counts.

¶ 28    In particular, the circuit court rejected the Board's and retirees' reliance on the fact that City officials knew about the Side Letter all along, stating, "[w]hile such evidence exists in the record, it is also irrelevant" because the Side Letter was neither incorporated into any collective bargaining agreement nor adopted by ordinance. As an additional basis for finding in favor of the City, the court noted that the City's annual appropriation ordinance did not constitute an adoption of the Side Letter because pension calculations were done by the Board, not the City. Further, it found, the City's approval of Board funding was done through periodic bulk funding requests rather than by an ordinance adopting the Side Letter. As we discuss in detail below, the court also rejected the Board's and retirees' affirmative defenses.

¶ 29    The circuit court further held that (1) the Board's reliance on the Side Letter was contrary to the Pension Code "and municipal law," (2) the City was not required to levy taxes or fund the Board based on the Side Letter, (3) the Board must recalculate the retirees' pensions in accordance with the salary set forth in the collective bargaining agreement and award future pension benefits to them on that basis, and (4) the Board was enjoined from using the Side Letter with respect to any future retirees. The court later denied the Board's and retirees' motions to stay the order pending appeal. Both the Board and retirees appealed, and this court consolidated the two appeals.

¶ 30                                    II. ANALYSIS

¶ 31    On appeal, both the Board and the retirees have proceeded holistically. They raise a host of contentions of error that relate to multiple counts and claims. With a few minor exceptions,

15

they do not direct any particular argument to either a particular count of the second amended complaint or a count in either counterclaim. Additionally, both the Board and the retirees have adopted each other's arguments as their own. For sake of clarity, we will address the City's second amended complaint first, followed by the defendants' affirmative defenses, and conclude with the defendants' counterclaims.

¶ 32 We begin by summarizing the issues each party raises in the briefs before us. The Board contends that the circuit court erred in finding that the Side Letter should not be used in the calculation of pension benefits. In particular, the Board argues that (1) the Pension Code and DOI regulations allow longevity bonuses to be used in the calculation of pensionable salary; (2) the City and the union were free to collectively bargain for "enhanced" benefits, which are constitutionally protected from diminution; (3) the City did, in fact, appropriate for the longevity benefit as calculated under the Side Letter; and (4) the Side Letter created a contract between the City and the retirees protecting their pension from reduction under the Illinois Constitution's pension-protection clause. The Board also argues that the court erred in denying the following affirmative defenses: (1) the City's remedy regarding any miscalculation of benefits was to seek administrative review of the Board's determination when an officer retired; (2) the Side Letter calculation method was subject to binding interest arbitration; (3) the City's claim is barred by *laches*; and (4) the City's claim is barred by the statute of limitations. The Board finally contends that it should have prevailed on its counterclaim because the City violated the Pension Code by not levying a sufficient tax for the pension fund.

¶ 33 The retirees, for their part, contend that the circuit court erred in granting summary judgment to the City, first, on counts IV and V of the City's second amended complaint (Judge Rooney's order) and second, on all the remaining counts. They also contend that they should

16

have prevailed on the following affirmative defenses: (1) unclean hands, (2) *laches*, (3) equitable estoppels, (4) waiver, (5) statute of limitations, (6) failure to seek administrative review[6] of the Board's initial computation of benefits, and (7) lack of jurisdiction because the dispute had been resolved in binding interest arbitration. On their counterclaims, they contend that the court should not have dismissed their original counterclaim with prejudice, but instead it should have given them leave to amend it. They also contend that the court erred by granting the City summary judgment on their second counterclaim because their pensions were constitutionally protected against reduction. Finally, they contend that even if the Side Letter was not incorporated into the successor contracts to the 2002 contract, at least the officers who retired during the term of the 2002 contract should have their pensionable salary calculated pursuant to the Side Letter.

¶ 34    Summary judgment is appropriate "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2016). Since the parties filed cross-motions for summary judgment, they conceded that no material questions of fact exist and that only questions of law are involved that the court may decide based on the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. The mere filing of cross-motions for summary judgment, however, does not establish that there is no issue of material fact, nor is a circuit court obligated to render summary judgment for either party. *Id.* We review the court's decision as to cross-motions for summary judgment *de novo*. *Id.* ¶ 30.

---

[6]The retirees raise this defense only with respect to the earliest-retiring officers. They concede that the City has, in fact, sought administrative review with respect to the pension calculations for the later-retiring defendants, Ernest Millsap, Brian Cozen, John Mikel, and Mark Battaglia. The record suggests that those administrative review cases have been stayed pending resolution of this appeal.

¶ 35    Our analysis begins with the operative statutes and the related administrative regulations. The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent, and the plain language of the statute is the best indication of that intent. *Acme Markets, Inc. v. Callanan*, 236 Ill. 2d 29, 37-38 (2009). "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning." *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 552 (2009). "The statute should be evaluated as a whole, with each provision construed in connection with every other section." *Id.* If the statutory language at issue is clear and unambiguous, a reviewing court must interpret the statute according to its terms without resorting to aids of statutory construction. *Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). Furthermore, "[a]dministrative rules and regulations have the force and effect of law, and must be construed under the same standards which govern the construction of statutes." *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008).

¶ 36    Because it has a population of less than 5000, the City is governed by article 3 of the Pension Code (40 ILCS 5/3-103 (West 2016)). Under article 3 of the Pension Code, the amount of a retired police officer's pension is determined by his age, length of service, and his salary at the time of retirement. *Id.* § 3-111. Police officers such as defendants shall receive a pension of one-half of

> "*the salary attached to the rank held on the last day of service* or for one year
>
> prior to the last day, whichever is greater. The pension shall be increased by 2.5%
>
> of such salary for each additional year of service over 20 years of service through

18

30 years of service, to a maximum of 75% of such salary." (Emphasis added.) 40

ILCS 5/3-111(a) (West 2002).[7]

¶ 37     Section 3-125.1 of the Pension Code specifies that a certain percentage of a police

officer's salary is deducted for pension contributions. The second paragraph of that section,

unchanged since at least 1987 (Ill. Rev. Stat. 1987, ch. 108½, ¶ 3-125.1), defines "salary." It

provides:

> " 'Salary' means the annual salary, including longevity, attached to the
>
> police officer's rank, as established by the municipality's appropriation ordinance,
>
> including any compensation for overtime which is included in the salary so
>
> established, but excluding any 'overtime pay', 'holiday pay', 'bonus pay', 'merit
>
> pay', or any other cash benefit not included in the salary so established." 40 ILCS
>
> 5/3-125.1 (West 2016).

¶ 38     The General Assembly has granted the DOI authority to issue regulations governing

municipal police and fire pension systems. *Id.* § 1A-103 (West 2016). In *Roselle Police Pension*

*Board*, 232 Ill. 2d 546, 559 (2009), our supreme court also noted that section 1A–106 of the

Pension Code invests the DOI with the responsibility to provide "advisory services" to local

police pension funds "on all matters pertaining to their operation." *Id.* The court further stated

that when, as here, the legislature "delegates to an agency the authority to clarify and define a

specific statutory provision, administrative interpretations of such statutory provisions should be

given substantial weight unless they are arbitrary, capricious, or manifestly contrary to the

statute." *Id.* (citing *Church v. State*, 164 Ill. 2d 153, 161-62 (1995)).

---

[7]Because retirees have a constitutionally protected right to the pension benefits legally provided at the time of their retirement (Ill. Const. 1970, art. XIII, § 5), we cite to the 2002 codification of the Pension Code, noting that the salient provisions relevant to this case have not changed over the course of time and therefore apply with equal force to the later-retiring defendants.

¶ 39 The DOI has promulgated regulations defining salary for the purpose of calculating a retiree's pension under article 3 of the Pension Code. One regulation defines "salary" as "any fixed compensation received by an employee of a municipality *** , which has been approved through an appropriations ordinance of the municipality. Salary is received regularly and is attached to the rank or class to which the firefighter or police officer is assigned." 50 Ill. Adm. Code § 4402.30 (1996). A related regulation defines longevity pay as "[a]dditional pay received after the employee has attained a specified number of years of service" that "may be received with regular salary or in one or more lump sum payments during the year." 50 Ill. Adm. Code § 4402.35(d) (1996). While the regulation allows longevity pay to be considered when determining pensionable salary, it cautions, "[w]hen paid in a lump sum, the amount should be prorated to determine the monthly equivalent to compute all pension contributions and benefits." *Id.*

¶ 40                     A. Operative Effect of the Side Letter

¶ 41 We first consider the defendants' appeal from Judge Rooney's order granting the City summary judgment on counts IV and V of the second amended complaint. The order declared the parties' rights as follows: (1) the collective bargaining agreement alone determines the longevity benefit calculation and (2) the Side Letter does not modify the collective bargaining agreement "in any fashion." Closely related issues arose again when Judge Cohen dismissed the retirees' first counterclaim. Judge Cohen declined to depart from Judge Rooney's earlier opinion.

¶ 42 Judge Rooney's order was based on the contracts' integration clause in section 25.1. Although neither she nor the parties characterized the argument as such, section 25.1 of the contracts is more commonly known as an integration clause. She found, in particular, that the integration clause was clear and unambiguous. As such, it foreclosed the possibility that the Side

Letter could somehow modify the contract. In addition to the integration clause analysis, the court found that because the Side Letter was never incorporated into any successor contracts, it did not apply to them, and it was "a nullity."

¶ 43    Illinois follows the "four corners rule," which precludes the consideration of extrinsic evidence where a contract contains an integration clause and is facially unambiguous. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). When parties include a formal integration clause into a contract, "they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence." *Id.* at 464. "During contract negotiations, a party may propose terms, conditions, and provisions which are ultimately rejected in order to reach a compromise with the other party. That other party, of course, may do the same. The integration clause makes clear that the negotiations leading to the written contract *are not* the agreement." (Emphasis in original.) *Id.* A party is free to negotiate a contract that omits an integration clause. If it does not, "it is bound by its bargain." *Id.* at 465.

¶ 44    In this case, the contracts themselves were duly approved by the City's corporate authorities. The Side Letter was not. In its ruling granting summary judgment on counts IV and V and in its later orders relying on that prior ruling, the circuit court properly found that the Side Letter was of no force or effect.

¶ 45     B. Validity of the Department of Insurance Longevity Benefit Proration Regulation

¶ 46    We next consider whether the circuit court properly granted summary judgment to the City on the remaining counts of its second amended complaint. In essence, these counts concerned whether the Board validly and legally calculated the retirees' pensions by multiplying the longevity bonus by 24 and adding that sum to the base salary to compute the retirees'

pensions. If this method was illegal or invalid, the next question is what the appropriate remedy should be.

¶ 47    The parties devote a considerable portion of their argument to the validity of the DOI regulation providing that a longevity bonus must be prorated. 50 Ill. Adm. Code 4402.35(d) (1996). The retirees attack the regulation, contending that it is "improperly drafted and is invalid as a matter of law" because it contradicts the plain language of section 3-111 of the Pension Code, which, in their view, requires that the officer's pension be pegged specifically to the salary earned on the last paycheck, annualized.

¶ 48    At the outset, we reject the retirees' claim that the regulation is invalid. The DOI regulation is consistent with the salary-related provisions of the Pension Code and they constitute a proper exercise of the DOI's authority under section 1A-103 of the Pension Code (40 ILCS 5/1A-103 (West 2016)). Indeed, section 1A-103 specifically authorizes the DOI "to promulgate rules necessary for the administration and enforcement" of the Pension Code and the rules adopted by the DOI "shall govern where conflict with local rules and regulations exists." *Id.* § 1A-103. Further, our supreme court has held that "an administrative agency has authority to regulate and execute the provisions of the statute and to carry out the powers conferred upon it." *Eastman Kodak Co. v. Fair Employment Practices Comm'n*, 86 Ill. 2d 60, 70 (1981). Regulations are presumed to be valid and have the force and effect of law. *Id.* at 71. Agency regulations may not exceed or alter the agency's statutory power, nor contravene legislative purpose and intent of statutes. *Id.* at 70.

¶ 49    Compensation plans for public employees can be complex, including elements such as seniority pay, holiday pay, bonus pay, and overtime pay. Depending on how the term "salary" in section 3-111(a) of the Pension Code is interpreted, it may, or may not, include some or all of

these elements. Section 3-125.1 of the Pension Code helps resolve that ambiguity. It declares that, while longevity pay can be included in an officer's pensionable salary, both the longevity pay and the base salary used for pension purposes must be that attached to the officer's *rank* (that is, not to the officer individually) and, further, that the salary must be that as specified in the municipality's appropriation ordinance, a measure that is normally enacted just once per year. 40 ILCS 5/3-125.1 (West 2016); 65 ILCS 5/8-2-1 (West 2016).

¶ 50    Along the same lines, section 3-125.1 also provides that certain irregular compensation elements, such as overtime, holiday, bonus, and merit pay, are *not* part of pensionable salary. 40 ILCS 5/3-125.1 (West 2016). The exclusion of these variable or irregular pay elements clearly indicates the legislature's intent that the pensionable salary be based on what the officer regularly received and would continue to receive absent his retirement, and that it not be artificially increased by fortuitous circumstances such as working long overtime hours immediately before retirement. This makes sense, because the officer's contributions to the pension fund itself are based on the officer's regular salary. *Id.* Consistent with these statutes, the regulation makes it clear that lump sum longevity pay must be prorated to a "monthly equivalent to compute all pension contributions and benefits." 50 Ill. Adm. Code § 4402.35(d) (1996). Therefore, pursuant to *Eastman*, the regulation is valid. See *Eastman*, 86 Ill. 2d at 70.

¶ 51    If we were to assume that the regulation was invalid or that the Side Letter calculation method itself was valid, we would easily obtain an utterly irrational result. Under the defendants' interpretation of the law, a municipality and its employees' union could agree that on the last paycheck, an officer would receive a longevity increase of, say, $100 for the officer's last *hour* of work. Assume, for the sake of this example, that the municipality duly appropriated specific funds to pay the $100 last-hour bonus in an appropriation ordinance, thus fulfilling the

23

"approved through an appropriations ordinance" requirement. Under the defendants' argument, that miniscule $100 expenditure would be multiplied by 24 hours in a day, and then remultiplied by 365 days in a year, to generate a pensionable salary $876,000 higher than that the officer actually earned in the prior year. This is an absurd result. When construing a statute, we must assume that the legislature did not intend to produce an absurd or unjust result and we must avoid, if possible, a construction leading to an absurd result. *Hubble v. Bi-State Development Agency of the Illinois-Missouri Metropolitan District*, 238 Ill. 2d 262, 283 (2010).

¶ 52    The $100 bonus in the example above was clearly intended to be granted one time only. Therefore, the "salary attached to the rank" under the Pension Code is the base salary plus the single $100 bonus, not the base salary plus an annualized bonus of $876,000. The regulation requiring that calculation method is consistent with the intent of sections 3-111 and 3-125.1 of the Pension Code and, despite the retirees' claim to the contrary, a valid exercise of DOI authority.

¶ 53                              C. Legality of the Side Letter Benefits

¶ 54    Having found the regulation to be valid, we continue our analysis of the order granting summary judgment to the City on counts I, II, III, and VIII of the second amended complaint. This court has had frequent occasion to examine the statutes and regulations at issue here in the context of preretirement longevity pay increases. A consistent line of cases instructs that, to be considered pensionable salary, extra pay elements must be duly appropriated by ordinance. In *Smith v. Board of Trustees of the Westchester Police Pension Board*, 405 Ill. App. 3d 626, 632-33 (2010), an officer contended that his pension should reflect a pay increase that the village's president and trustees instructed the village manager to give to the officer. The *Smith* court found that such mere instructions did not satisfy the requirement that the pension be based on an

appropriation ordinance because the instructions were not the equivalent of such an ordinance. *Id.* at 633.

¶ 55    *Village of Chicago Ridge v. Chicago Ridge Firefighters' Pension Board of Trustees*, 2016 IL App (1st) 152089, even more closely parallels the dispute before us. The Chicago Ridge firefighters received a preretirement 20% "buyout" bonus that was never approved through an appropriations ordinance. *Id.* ¶¶ 1, 18. The bonus, paid "per hour" only for the firefighter's last day of service, was explicitly set forth in a letter of understanding between the village and the union. *Id.* ¶ 4. The letter of understanding, in turn, was specifically incorporated into a collective bargaining agreement that was duly approved by resolution of the village board. *Id.* ¶ 13. The court first rejected reliance on the approval of the letter of understanding by resolution, stating, "that is not the same as being approved through an appropriations ordinance." *Id.* ¶ 18. Specifically, relying on what is known as the "equal dignity rule," the court held that a mere resolution was insufficient to effectuate what the law requires to be accomplished by ordinance. *Id.* (citing *Illinois Municipal Retirement Fund v. City of Barry*, 52 Ill. App. 3d 644, 647 (1977)). See also *McCarty v. City of Rockford*, 96 Ill. App. 3d 531, 534 (1981) (collecting cases regarding the equal dignity rule). Second, the *Chicago Ridge* court stated the resolution approving the union contract was not an appropriation at all because "[a]n appropriation involves the setting apart from public revenue a certain sum of money for a specific object." 2016 IL App (1st) 152089, ¶ 18.

¶ 56    Here, there is no dispute that the City never enacted any ordinance appropriating the longevity bonus times 24 pay periods for any of the retirees. Additionally, the Side Letter was never approved by the City corporate authorities in any manner, either by resolution or ordinance. Accordingly, under section 3-125 of the Pension Code, *Smith*, and *Chicago Ridge*, the

retirees' pensions were miscalculated by improperly multiplying the longevity bonus by 24 pay periods and adding the resulting product to the base pensionable salary.

¶ 57    D. The City's Actuarially Determined Funding Obligations to the Pension Board

¶ 58    We next address the portion of the City's motion for summary judgment as to count III, which requested a declaratory judgment that the City was funding the Board in accordance with the Pension Code. Section 3-125(a) of the Pension Code (40 ILCS 5/3-125(a) (West 2016)) requires the City to

> "annually levy a tax upon all the taxable property of the municipality at the rate on the dollar which will produce an amount which, when added to the deductions from the salaries or wages of police officers, and revenues available from other sources, will equal a sum sufficient to meet the annual requirements of the police pension fund."

The statute proceeds to specifically define "annual requirements," an amount computed based on assets on hand, future needs of the fund, and application of various actuarial principles to determine the reserves necessary to ensure adequate future funding. *Id.*; see also *id.* § 3-127. Section 3-143 of the Pension Code, in turn, requires the Board to annually certify the amount *it* estimates is needed to meet the funding requirements of sections 3-125 and 3-127. *Id.* § 3-143. Sections 3-125 and 3-143 of the Pension Code are somewhat in tension with each other because, depending on the actuarial assumptions applied, each entity may arrive at a different figure. Not surprisingly, this tension has resulted in litigation grounded in the natural tendency of each side to use actuarial assumptions favorable to its own interests.

¶ 59    This court has determined that a municipality is not strictly bound by its employees' pension board's calculations but rather enjoys some level of discretion in determining the

required annual funding amount based on its own actuarial assumptions. The municipality, is, nonetheless, bound by the requirements of section 3-125 of the Pension Code. See, *e.g.*, *Board of Trustees of the City of Harvey Firefighters' Pension Fund v. City of Harvey*, 2017 IL App (1st) 153074, ¶¶ 199-200; *Board of Trustees of the Police Pension Fund of the City of Evanston v. City of Evanston*, 281 Ill. App. 3d 1047, 1051-52 (1996); *Board of Trustees of the Police Pension Fund of Rockford v. City of Rockford*, 96 Ill. App. 3d 102, 108 (1981). Judicial intervention into the give-and-take between the pension board and the municipality is usually reserved for situations when the pension has been so underfunded that actual benefits are on the verge of being diminished or impaired. *People ex rel. Sklodowski v. State*, 182 Ill. 2d 220, 233 (1998); *McNamee v. State*, 173 Ill. 2d 433, 445-46 (1996); *City of Harvey*, 2017 IL App (1st) 153074, ¶ 195.

¶ 60    The defendants contend that the City has not levied any pension tax at all, but that assertion is misleading. When questioned at oral argument, counsel for the Board indicated that the Board takes the position that the statutory requirement that the City "shall" levy a property tax to fund the pension system is mandatory and that the City may not fulfill its statutory funding obligations by drawing available funds from non-property tax sources. The record reveals that the City has not ignored its statutory funding obligations, because the City has provided funding through non-real estate tax sources, as it is entitled to do. See M. Neal Smith, *Police Officers' and Firefighters' Pension Boards*, in Municipal Law: Financing, Tax, and Municipal Property § 7.32 (Ill. Inst. for Cont. Legal Educ. 2018) (noting that municipalities that "receive lucrative sales tax proceeds" and "do not levy a property tax could theoretically fund their pension requirements through sources other than property taxes"). The real dispute stems from the fact that the City funds the Board using its own section 3-125 actuarial calculations, which do not

27

take the Side Letter benefits into account. To a creditor, receiving payment for a $100 debt from a wallet is the functional equivalent as receiving it from a cash box. So if the City funds the Board in an amount computed pursuant to statute, we do not believe that the Board has a right to insist on its own preferred *source* of that funding. Thus, the dispute before us simply boils down to whether the City must account for the Side Letter benefits when calculating its annual funding obligations to the Board. We have already found that the collective bargaining agreement alone governs the retirees' salary for pension purposes, the Side Letter does not modify the collective bargaining agreement in any way, and the Side Letter calculation method violates the Pension Code and DOI regulations. Therefore, there is no need to fund for benefits granted because of the Side Letter calculation method. The central holding of cases such as *Evanston*, *Rockford*, and *Harvey* is that as long as the municipality funds the Board in an amount computed pursuant to section 3-125 of the Pension Code, there is no cause for judicial intervention. The battle between a parsimonious municipality and a covetous pension board over whose actuarial calculations are superior is left to be resolved by the political process, not the courtroom. We find that *Evanston* and the related cases are well-reasoned, and we find no reason to depart from their holdings here. Having found that the Side Letter calculation method was improper, the City was justified in not including Side Letter benefits in its actuarial calculations. Accordingly, the circuit court properly found that the City's existing funding mechanism complied with the Pension Code.

¶ 61                          E. Affirmative Defenses

¶ 62    Up to this point, we have considered the City's claims set forth in counts I, II, III, and VIII of its second amended complaint, and have found that those claims are meritorious. However, we have done so without considering whether City is barred from relief by any of the defendants' affirmative defenses. We consider each of those defenses in turn.

¶ 63                                          i. *Laches*

¶ 64     The defendants argue that the City's claims are barred by the doctrine of *laches*. "*Laches* is an equitable principle which bars recovery by a litigant whose unreasonable delay in bringing an action for relief prejudices the rights of the other party." *People ex rel. Daley v. Strayhorn*, 121 Ill. 2d 470, 482 (1988). For *laches* to bar a claim, "it must appear that a plaintiff's unreasonable delay in asserting his rights has prejudiced and misled the defendant, or caused him to pursue a course different from what he would have otherwise taken. [Citations.] If the defendant is not injured by the delay, then plaintiff is not guilty of *laches*." *People ex rel. Casey v. Health & Hospitals Governing Comm'n of Illinois*, 69 Ill. 2d 108, 115 (1977). Because it is an equitable doctrine, a court has discretion to determine whether *laches* applies in a particular case. *Finley v. Finley*, 81 Ill. 2d 317, 330 (1980). Therefore, we reverse a trial court's determination regarding applicability of *laches* only if that decision was an abuse of discretion. *Lozman v. Putnam*, 379 Ill. App. 3d 807, 822 (2008). A court abuses its discretion when its decision was " 'palpably erroneous, contrary to the manifest weight of the evidence, or manifestly unjust.' " *Id.* (quoting *O'Brien v. Meyer*, 281 Ill. App. 3d 832, 835 (1996)). A court also abuses its discretion only when its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the circuit court. *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 65     The record amply supports the circuit court's finding that *laches* does not apply. The issue presented involves the illegal expenditure of public funds. Our supreme court has cautioned that while governmental bodies do not enjoy total immunity from *laches*, the doctrine is to be applied sparingly against them and only under "compelling," "unusual[,] or extraordinary circumstances." *Van Milligan v. Board of Fire & Police Commissioners of the Village of*

*Glenview*, 158 Ill. 2d 85, 90 (1994). This is because "valuable public interests may be jeopardized or lost by the negligence, mistakes or inattention of public officials." *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-48 (1966). While we recognize that the retirees may have proceeded in reliance on the Board's original (but illegal) computations, the public interest in enforcing the Pension Code and ensuring fiscal solvency of the local fund must take priority over the retirees' expectations. The circuit court correctly found that the City's claims were not barred by *laches.*

¶ 66                                    ii. Estoppel

¶ 67    Similarly, the defendants contend that the City should be estopped from seeking modification of the retirees' pensions because the City offered the Side Letter calculation method to the retirees but then later sued to invalidate the benefits that the method granted to the retirees. Equitable estoppel prevents a party from asserting rights where doing so would work a fraud or injustice on another party. *Hillenbrand v. Meyer Medical Group, S.C*., 308 Ill. App. 3d 381, 386 (1999); *Board of Trustees of the Addison Fire Protection District No. 1 Pension Fund v. Stamp*, 241 Ill. App. 3d 873, 879 (1993).

¶ 68    Our supreme court's recent decision in *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, is instructive. *Patrick* involved whether equitable estoppel applied against a city based on the act of a city employee. The *Patrick* court stated that equitable estoppel against a municipality will lie only "in extraordinary and compelling circumstances." *Id.* ¶ 35.

> "[A] plaintiff seeking to invoke equitable estoppel against a municipality must
> plead specific facts that show (1) an affirmative act by either the municipality
> itself or an official with express authority to bind the municipality; and

(2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position." *Id.* ¶ 40.

Agency and reliance are typically questions of fact, but a plaintiff still "must offer more than mere conclusions on these elements because Illinois is a fact-pleading jurisdiction, and because, when public revenues are at stake, estoppel is particularly disfavored." *Id.* Further, "the private party must have not only substantially changed its position, based on the affirmative act of the municipality or its officials [citation], but also justifiably done so, based on its own inquiry into the municipal official's authority." *Id.* ¶ 39.

¶ 69    The defendants vehemently argue the point that the City itself bargained with the FOP in 2002 to give retiring officers a "pension spike," and that everyone involved knew exactly what they were doing and what it would cost. They also argue that the City, as employer, and the union, representing the employees, can collectively bargain and contract to give the employees rights or benefits of whatever level they so chose. Once the Board went along with the Side Letter program, they contend, the deal was sealed and the retirees' benefits were locked in place in perpetuity. What this argument misses is that the City, Board, and employees all function within a larger system created by state law. To give one example: The assets from which police pensions are paid result from a combination of employee payroll withholding, funding from the host municipality through a property tax levy or other source, and earnings on investments. 40 ILCS 5/3-125(d), 3-132 (West 2016). Among other things, (1) section 3-125.1 of the Pension Code (*id.* § 3-125.1) requires that 9.91% of an officer's salary be withheld and transmitted to the pension fund, a level that the legislature deemed was appropriate, in addition to other funding sources, to ensure eventual funding of the officer's pension and (2) state laws limit what a pension board may invest in, thus restricting the board's ability to choose certain high-return (but

high-risk) investments. See *id.* §§ 1-113.2, 1-113.3, 1-113.4, and 1-113.4a. The City is a home rule government,[8] so it can levy unlimited property taxes to fund the pension board's needs, but many municipalities with pension boards do not enjoy home rule status and are therefore subject to tax caps. See *Village of Spring Grove v. County of McHenry*, 309 Ill. App. 3d 1010, 1014 (2000). If the defendants' arguments were correct, then a city administration and the union could agree to grant officers million-dollar-a-year pensions, and future administrations would be helpless but to find some way to fund that largesse for decades, despite the limitations on funding imposed by state law. This would be an absurd result, and we decline to reach it here.

¶ 70    When the Side Letter was used to increase the retirees' pensions, the Pension Code, DOI regulations, and lack of a corresponding appropriation ordinance all put the retirees on fair notice that the increase in their pensions was illegal. The retirees were not justified in relying on any representations made by the City as to the Side Letter calculation method. Under the facts presented, we cannot say that the circuit court erred in rejecting the affirmative defense of equitable estoppel.

¶ 71                                    iii. Arbitration

¶ 72    The defendants also presented an affirmative defense regarding the City's submission of a claim regarding the longevity calculation method to binding arbitration between the City and the union. The arbitrator issued an award against the City on that issue. Despite the City's lack of success in the arbitral forum, there are several reasons why the City's claims nonetheless survive. First, the arbitration in question only applied to one particular contract term, 2010-13. More importantly, though, the arbitration did not, and could not, address the legality of the "pension spike" as to individual defendants who had already retired and were therefore not subject to the

---

[8]The City's home rule status is noted in City of Countryside Municipal Code § 1-12-3 (eff. May 13, 1998); § 1-13-2 (eff. April 4, 1999) (referring to the City as a "home rule unit of government").

32

contract being arbitrated. Essentially, the arbitrator held that because there was no evidence presented regarding "the effect of the 'Pension Spike,' " the City failed to meet its burden to justify a change from the existing contract language regarding the longevity benefit. The arbitrator did not address the issue presented here, which is whether the calculation method conformed to the Pension Code or the DOI regulations.

¶ 73    A very similar issue arose in *Chicago Ridge*. There, the court rejected the pension board's reliance on a prior arbitration hearing, noting that because "the language of the Pension Code and the Illinois Administrative Code is clear and unambiguous where it defines a pensionable salary as one that is approved through an appropriations ordinance," the arbitration award was not relevant. *Chicago Ridge*, 2016 IL App (1st) 152089, ¶ 19. The *Chicago Ridge* court's analysis was sound, and we see no reason to depart from it here. The circuit court did not err in rejecting this affirmative defense.

¶ 74                            iv. Failure to Seek Administrative Review

¶ 75    The defendants also contend that the City waited too long to seek relief. They characterize these claims under various theories: statute of limitations, failure to timely seek administrative review, and standing. Regardless of how the defendants characterize these defenses, we find them unavailing.

¶ 76    The Board clearly has the statutory authority to calculate and award pensions to retirees. 40 ILCS 5/3-133 (West 2016). If its calculation of benefits based on the Side Letter was erroneous, its decision to do so is not void, but merely voidable. *Board of Education of the City of Chicago v. Board of Trustees of the Public School Teachers' Pension & Retirement Fund of Chicago*, 395 Ill. App. 3d 735, 741 (2009) (*Chicago Board*). Many cases have rejected tardy challenges to pension calculations relying on the voidable-but-not-void doctrine or failure to

33

timely seek administrative review. See, *e.g.*, *Sola v. Roselle Police Pension Board*, 342 Ill. App. 3d 227, 230-31 (2003); *Rossler v. Morton Grove Police Pension Board*, 178 Ill. App. 3d 769, 773-74 (1989). The defendants suggest those cases are dispositive here. We disagree. Those cases involved disputes between a pensioner—someone who has applied to the pension board for specific relief—and the Board itself.

¶ 77    Here, in contrast, the dispute is between the City, which funds the Board, on the one hand, and the aligned interests of the Board and retirees on the other. The dispute here did not arise from a matter in which the City was a party to some case, application, or dispute formally adjudicated by the Board. Instead, it arose through a systematic miscalculation, which falls outside the definition of an "administrative decision" under the Administrative Review Law. *Chicago Board*, 395 Ill. App. 3d at 744. Our supreme court explained that a court "may consider at any time a claim that a retirement board's decision was so seriously in error that the board exceeded its inherent authority and rendered a void decision." *People ex rel. Madigan v. Burge*, 2014 IL 115635, ¶ 38. This authority extends to the ability to challenge a pension board's fiduciary breaches, including "fraudulent or corrupt decisions" as well as the ability of a host government that was not a party to the original proceeding to later challenge its own pension board's decision, if the board's decision "would result in the diminution of" the pension fund. *Id.* That precisely defines the dispute before us.

¶ 78    The *Burge* decision supports the *Chicago Board* court's analysis. In *Burge*, the court emphasized that because preventing "significant violations of the Pension Code and ensuring the fiscal integrity" of pension funds were such important goals, "challenges to actions taken by a retirement board have been authorized both within the context of administrative review and without." *Id.*. The *Burge* court cited *Chicago Board* with approval, stating:

"In addition, our appellate court has recognized that, in certain circumstances, a governmental entity which was not a party before a pension board proceeding may contest a retirement board's administrative decision when it would result in the diminution of a pension fund. *Karfs v. City of Belleville*, 329 Ill. App. 3d 1198 (2002); see also *Board of Education of the City of Chicago v. Board of Trustees of the Public Schools Teachers' Pension & Retirement Fund*, 395 Ill. App. 3d 735 (2009) ('systemic miscalculations' by a pension board are not administrative decisions and may be challenged outside the Administrative Review Law). These avenues for legal challenge to the actions of a pension board exist in addition to general civil and criminal oversight, including criminal provisions found in the Pension Code itself [citation], and regulatory oversight provided by the Department of Insurance [citation]." *Burge*, 2014 IL 115635, ¶ 38.

¶ 79 Based on these authorities, we find that the circuit court did not err in rejecting the defendants' affirmative defense based on failure to timely seek administrative review.

¶ 80 v. Pension Protection Clause of the 1970 Illinois Constitution

¶ 81 Article XIII, section 5, of the 1970 Illinois Constitution, commonly known as the "pension protection clause," provides: "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5. The defendants contend that the clause prevents a court from ever diminishing the retirees' pensions, even if doing so was done only to eliminate an excess illegal payment and reduce the pensions to the level authorized by law.

¶ 82    Our supreme court has observed that it "has consistently held that the contractual relationship protected by section 5 of article XIII is governed by the actual terms of the contract or pension plan in effect at the time the employee becomes a member of the retirement system." *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 59 (citing cases). The *Matthews* court explained:

> "While the pension protection clause guarantees the vested rights provided in the contract that defines a participant's retirement system membership, it does not change the terms of that contract or the essential nature of the rights it confers. Accordingly, the pension protection clause does not transform a nonvested right to retirement benefits into one that is vested." *Id.*

The governing contract here is the collective bargaining agreement, unmodified by the Side Letter, and we have found that the collective bargaining agreement itself does not support the application of the Side Letter calculation method.

¶ 83    In recent years, our supreme court has confronted a number of legislative attempts to reduce vested pension rights. The court has consistently held that, under the pension protection clause, public employees have an absolutely inviolable contractual right to their vested pension benefits, a right that can never be diminished or impaired. See, *e.g.*, *Jones v. Municipal Employees' Annuity & Benefit Fund*, 2016 IL 119618; *In re Pension Reform Litigation*, 2015 IL 118585; *Kanerva v. Weems*, 2014 IL 115811. The defendants rely on these cases to support their contention that the circuit court could not enter any order diminishing the benefits that the Board awarded them upon their respective retirements. Again, we find these cases distinguishable and the defense ineffective. We acknowledge that, in light of this line of authorities from a higher court, that holding might seem anomalous. It is not. In *Kanerva* and the other cases, the supreme

court was called upon to review legislation that diminished the vested pension rights of current or retired employees and, thus, breached the contract between the State and the retiree. No issue arose in those cases that the employees' pensions had been incorrectly calculated from the beginning. Here, in contrast, the retirees' pensions were calculated incorrectly on day one—based on the employment contract, statutes, and regulations then and now in force. The retirees could only "contract" for benefits allowed by law. Put simply, "[a] right cannot be protected if it does not exist." *Underwood v. City of Chicago*, 2017 IL App (1st) 162356, ¶ 26. A host of individuals affiliated with the City, aided by the employees who sat at the bargaining table, constructed a fictitious calculation method based on erroneous advice and used the method to award pensions far higher than those permitted by law. They steadfastly refused to rectify the situation after the DOI admonished them—several times over the course of a number of years—that the method was illegal. Although we understand that some or all of the retirees may have left service in reliance on the advice given to them at the time of retirement, they are nonetheless charged with knowledge of the laws. See *Schlosser v. Jursich*, 87 Ill. App. 3d 824, 826 (1980) ("individuals are presumed to have contracted with knowledge of existing law"). The pension protection clause does not prevent the court from imposing a remedy to bring the retirees' pensions to the correct level permitted by law existing upon their retirements.

¶ 84                                vi. Waiver

¶ 85    The defendants contend that the City "waived its arguments concerning the collective bargaining agreement and side letter by renegotiating these agreements and re-entering into agreements with the same effect." Aside from a fleeting reference to a single case containing a boilerplate definition of waiver, they fail to support this argument with any specific legal authorities. Therefore, we consider the point forfeited. See *Vancura v. Katris*, 238 Ill. 2d 352,

370 (2010) ("even where the brief includes both argument and citation, a party may nonetheless forfeit review if the cited authority is irrelevant and does not represent a sincere attempt to comply with the rule"). Forfeiture aside, the defendants' waiver argument is largely duplicative of their estoppel and *laches* arguments, and it fails for the same reasons. Additionally, the defendants' argument regarding the City-appointed members of the Board fails to note that these appointees only constitute two of the five members of the Board. See 40 ILCS 5/3-128 (West 2016). The benefits at issue could not have been approved without the support of the three other Board members, who are drawn from the ranks of active and retired officers. *Id.*

¶ 86                                vii. Statute of Limitations

¶ 87    The defendants contend that the City's claims are barred by the five-year statute of limitations generally applicable to civil actions (735 ILCS 5/13-205 (West 2016)). The City filed this case on February 24, 2012. Five years before that date is February 24, 2007. Of the 13 defendant retirees, 7 retired and began earning a pension before February 24, 2007. The remaining six retired after that date. The City's claims against those six would presumably be unaffected by the statute of limitations. Additionally, the City has filed separate administrative review claims as to three of the six. But the statute of limitations argument is at least facially relevant to the remaining seven defendant retirees. The circuit court rejected the statute of limitations defense, finding that it was without merit because "the City was not aware of the legality of the longevity calculations until 2009 at the earliest." That analysis is true only to a point because the record clearly shows that prior high-level City officials had every reason to know that the Side Letter computation method was illegal long before the current administration took office. We are troubled by the City's argument that the statute of limitation clock resets whenever a new City administration takes office and "discovers" misdeeds of a prior

38

administration. That theory ignores the fact that the City government is a single entity with a continuing existence, regardless of who is in office. As this court has explained:

> "The parties agree that the City Council is a continuing body, the existence of which never ceases by reason of a change of membership. The continuing body concept serves as the useful legal fiction needed to accomplish such desirable public policy considerations as protecting the contract rights of persons who had contracted with the previous municipal body, sustaining the existence of a body that can act during periods of transition and affirming the ability of one city council to act upon the uncompleted business of a previous council." *Roti v. Washington*, 114 Ill. App. 3d 958, 969 (1983).

The City's position is reminiscent of this classic scene in *Casablanca*:

> "CAPTAIN RENAULT: I'm shocked! Shocked to find that gambling is going on in here.
>
> [*a croupier hands Renault a pile of money*]
>
> CROUPIER: Your winnings, sir.
>
> CAPTAIN RENAULT: [*sotto voce*] Oh, thank you very much.
>
> [*aloud*]
>
> CAPTAIN RENAULT: Everybody out at once." Casablanca (Warner Bros. 1942).

We are likewise concerned that many individuals who loyally served the city as first responders relied on the City administration's acquiescence to the Side Letter computation method, illegal though it was, when they made decisions regarding their retirement and financial plans. Their reliance interest is substantial and cannot be ignored. The City argues that it had no duty to know

the legality of the Side Letter computation method. But the record demonstrates that even City officials who were not at the bargaining table and who did not vote to approve the Side Letter were fully aware of what would occur when the senior officers retired and applied for pensions. Therefore, we cannot reject the defendants' statute of limitation defense merely because a new group of City officials "discovered" the illegal pension spike after they took office.

¶ 88     "As a reviewing court, we can sustain the decision of a lower court on any grounds which are called for by the record, regardless of whether the lower court relied on those grounds and regardless of whether the lower court's reasoning was correct." *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 97 (1995). We agree with the circuit court that the statute of limitations defense fails but for a different reason. Section 13-205 of the Code provides that "all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued." 735 ILCS 5/13-205 (West 2016). The supreme court has held that statutes of limitation are applicable to actions at law, but "are not directly controlling in suits seeking equitable relief." *Meyers v. Kissner*, 149 Ill. 2d 1, 12 (1992). Even so, a statute of limitation can be a convenient measure for determining the length of time that ought to operate as a bar to an equitable cause of action. "Depending upon the particular circumstances before the court, however, equitable relief may be refused although the time fixed by the statute of limitations has not expired, or conversely, relief may be granted even though the limitation period had long since elapsed." *Id.* For equitable actions such as the one before us, whether a plaintiff has sued too late is often considered under a *laches* analysis rather than by applying the five-year limitation period applicable to general civil case. *Sundance Homes, Inc. v. County of Du Page*, 195 Ill. 2d 257, 270 (2001). Even so, *laches* is not "mechanically applied," and the general five-year limitation period may sometimes bar an equity case. *Id.* at 271 (citing cases). Since we have already

determined that *laches* does not bar the City's claim, we will proceed to consider the defendants' five-year statute of limitations defense.

¶ 89    Generally, "a limitation period begins 'when facts exist which authorize one party to maintain an action against another.'" *Id.* at 266 (quoting *Davis v. Munie*, 235 Ill. 620, 622 (1908)). However, under the "continuing violation rule," if a claim involves a continuing or repeated injury, the limitations period does not begin to run until the date of the last injury or the date the acts cease. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 345 (2002). A continuing violation stems from continuing unlawful acts and conduct, not merely by continual ill effects from an initial violation. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 278 (2003). Accordingly, we must determine whether the Board's issuance of monthly pension checks to the retirees, based on its initial determinations at the respective dates of each retirement, is a continuing violation such that the limitation period would not run until the date of the most recent pension check.

¶ 90    We find *Belleville Toyota*, 199 Ill. 2d at 348-49, instructive on this issue. There, our supreme court reviewed whether the statute of limitations barred automobile dealers' claims against a manufacturer for breaching a supply agreement and for violations of the Motor Vehicle Franchise Act (815 ILCS 710/1 *et seq.* (West 2000)). *Belleville Toyota*, 199 Ill. 2d at 333. The dispute involved a series of allocations of vehicle deliveries to the dealers. The manufacturer made the allocations two to four times per month over a course of time. *Id.* at 348. The court found that these allocations did not constitute one, continuing, unbroken, decade-long violation of the Motor Vehicle Franchise Act but instead found that each allocation was a separate violation supporting a separate and new cause of action. *Id.* at 348-49. Accordingly, the court determined that the dealers could maintain a cause of action, and obtain damages, only for the

41

particular allocations that occurred in the four years[9] immediately preceding the filing of the complaint. *Id.* at 349.

¶ 91    This case involves the Board's monthly issuance of each retiree's pension check and annual disputes between the City and the Board over the level of required funding. These occurrences parallel the allocations at issue in *Belleville Toyota*. We therefore find that (1) the applicable date for statute of limitations analysis is not 2002, when the Board first began miscalculating pensions using the Side Letter method; (2) each monthly check and annual funding dispute triggers a separate limitation period; (3) the five-year statute of limitations in section 13-205 of the Code does not entirely bar the City's claims so as to constitute a complete defense thereto; and (4) the City's claims are limited to those arising after February 24, 2007. Having so found, we look to the relief that the circuit court granted to determine if it ran afoul of that limitation.

¶ 92    Judge Rooney's order granting summary judgment to the City on counts IV and V of the second amended complaint stated the following: "As such, this ruling applies prospectively and does not address or affect those pensioners already receiving benefits." Judge Cohen's ruling granting summary judgment on the remaining counts found that the use of the Side Letter calculation method was contrary to the Pension Code and municipal law, and further stated:

> "(2) the City is not required to levy taxes or otherwise fund
> pension amounts based on the calculations set forth in the Side
> Letter; (3) the Pension Board must recalculate the pensionable
> salaries of the Individual Defendants in accordance with the
> provisions of the CBA and award future pension benefits to the

---

[9]The relevant limitation period for the cause of action at issue was four years, rather than the five years at issue here. *Belleville Toyota*, 199 Ill. 2d at 349.

Individual Defendants on this basis; and (4) the Pension Board is hereby enjoined from using the provisions of the Side Letter to calculate any future retiree's pensionable salary."

¶ 93 Thus, the orders before us only require that, going forward, (1) the City may fulfill its annual funding obligations through an actuarial analysis that complies with section 3-125 of the Pension Code but assumes that the retirees' pensions have been reduced to omit additional benefits created by the Side Letter calculation method; (2) the retirees' monthly pensions should be recalculated without using the Side Letter calculation method; and (3) future retirees' benefits must be calculated in the same manner. These remedies, which require the pensions to be reduced only going forward, are fair under the circumstances. At oral argument, counsel for the City confirmed that it does not seek to claw back any excess pensions from the retirees. That decision is not only fair, but quite wise from a legal standpoint. It would be manifestly unfair to force the retirees and surviving spouses to pay the City back for pensions they received years ago, since the City itself (through the fault of the administration in office in 2002) bears much of the responsibility for this financial fiasco. Since none of the circuit court's remedies claws back any benefits already received by the retirees, none reaches back earlier than 2007 so as to be barred by the statute of limitations. Therefore, the circuit court did not err in denying the defendants' statute of limitations defense.

¶ 94 In sum, we find that the circuit court did not err in granting summary judgment to the City on its claims, properly finding for the City on the merits of counts I, II, III, IV, V, and VIII, and by rejecting the defendants' affirmative defenses.

¶ 95                                                  F. Counterclaims

¶ 96    We next consider the defendants' contentions regarding their counterclaims. On appeal, the retirees contend the circuit court erred in dismissing all four counts of the first counterclaim with prejudice. About a year after that dismissal, the retirees sought leave to file a new counterclaim. The retirees captioned that counterclaim as their "SECOND" counterclaim. The second counterclaim contained a single count alleging that diminishing the retirees' pensions would violate the pension clause of the Illinois Constitution. They raised no such constitutional claim in their original counterclaim and the second counterclaim contained no reference to the previously dismissed four counts of the original counterclaim. Our supreme court has explained that "a party who files an amended pleading waives any objection to the trial court's ruling on the former complaints," and " '[w]here an amendment is complete in itself and does not refer to or adopt the prior pleading, the earlier pleading ceases to be a part of the record for most purposes, being in effect abandoned and withdrawn.' " *Foxcroft Townhome Owners Ass'n v. Hoffman Rosner Corp.*, 96 Ill. 2d 150, 153-54 (1983) (quoting *Bowman v. County of Lake*, 29 Ill. 2d 268, 272 (1963)). The *Foxcroft* court explained:

> "When a complaint is amended, without reference to the earlier allegations, it is expected that these allegations are no longer at issue. Defendants would be disadvantaged by a rule which would, in effect, permit a plaintiff to proceed to trial on different issues contained in separate complaints. In contrast, we perceive no undue burden in requiring a party to incorporate in its final pleading all allegations which it desires to preserve for trial or review." *Id.* at 154.

We find that the retirees forfeited their ability to appeal the dismissal of their first counterclaim.

¶ 97 The retirees contend that the circuit court should have given them leave to amend the dismissed first counterclaim. They forfeited this argument as well, since they never asked to amend the first counterclaim and, thus, gave the court no opportunity to decide whether to allow them to amend. *Thompson v. N.J.*, 2016 IL App (1st) 142918, ¶ 64. Forfeiture aside, we will review the denial of leave to amend for abuse of discretion. *County of Cook ex rel. Rifkin v. Bear Stearns & Company*, 215 Ill. 2d 466, 474 (2005). Since the court eventually granted them leave to file a second counterclaim, this argument rings somewhat hollow. At any rate, a court does not err by denying leave to amend if the party does not present the proposed amendment to the trial court. *Old Salem Chautauqua Ass'n v. Illinois District Council of the Assembly of God*, 13 Ill. 2d 258, 267 (1958). This is because, when determining whether to grant leave to amend, the court must consider—among other things—whether the proposed amendment would cure defects in the original dismissed pleading. See *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992) (setting forth a four-part test). The record before us is bereft of any such proposed amended counterclaim, other than—arguably—the second counterclaim. As noted above, after the court dismissed the first counterclaim, the retirees did not move to reconsider the dismissal order, did not ask to amend, and did not proffer a proposed amended counterclaim. Instead, they stood on their first counterclaim and filed a premature appeal that this court dismissed for lack of jurisdiction. Forfeiture aside, we cannot find the court abused its discretion by refusing to allow the retirees to file an amended version of their first counterclaim.

¶ 98 The retirees filed a second counterclaim that contained a single count, alleging that the Illinois Constitution's pension protection clause protected the retirees' original pensions from reduction. The circuit court granted summary judgment in favor of the City on this counterclaim, finding that the collective bargaining agreement—not the Side Letter—was the only contract

between the retirees and the City. For the reasons set forth in our discussion of the defendants' pension protection clause affirmative defense, the court did not err in granting summary judgment to the City on the retirees' second counterclaim.

¶ 99    The Board filed a two-count counterclaim alleging that the City improperly failed to provide funding to the Board as required by section 3-125 of the Pension Code. The Board's allegations are rather broad in scope and could be read to claim that the City never funded the Board at all. But the record contains facts revealing that the City has funded the Board through non-property tax sources. The City's funding was actuarially computed based on the assumption that the retirees were not entitled to benefits calculated under the Side Letter method. The circuit court granted the City's motion for summary judgment on the Board's counterclaim, and again we find no error. For the reasons expressed above with respect to count III of the City's second amended complaint, the court did not err in granting the City summary judgment on both counts of the Board's counterclaim.

¶ 100                            III. CONCLUSION

¶ 101    We affirm the orders of the circuit court (1) granting summary judgment in favor of the City on counts IV and V of its second amended complaint; (2) granting summary judgment in favor of the City on counts I, II, III, and VIII of its second amended complaint; (3) granting summary judgment in favor of the City on the Board's counterclaim and the retirees' second counterclaim; (4) dismissing the retirees' first counterclaim; (5) denying the Board summary judgment on its counterclaim; and (6) denying the retirees summary judgment on their second counterclaim.

¶ 102    Affirmed.

46